Richard C. **BARTEL**, Appellant

v.

**FEDERAL AVIATION ADMINISTRATION, et al.**

Richard C. **BARTEL**, Appellant

v.

**UNITED STATES of America.**

Nos. 82–2473, 82–2481.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 3, 1983.

Decided Jan. 17, 1984.

J.E. McNeil, Washington, D.C., with whom Richard Manning Ricks, Washington, D.C., was on brief, for appellant in Nos. 82–2473 and 82–2481.

John D. Bates, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Washington, D.C. (at the time the brief was filed), Royce C. Lamberth and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on brief, for appellees in Nos. 83–2473 and 82–2481.

Before WRIGHT, WILKEY and WALD, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

▪ The plaintiff, Richard Bartel, appeals dismissal of his claims against the Federal Aviation Administration (FAA) and Brian Vincent, an FAA official. Bartel,

proceeding *pro se*,[1] alleged that the FAA violated the Privacy Act of 1974, 5 U.S.C. § 552a, and is liable for a tortious invasion of his privacy under the Federal Torts Claims Act, 28 U.S.C. §§ 2671–80. He also sued the FAA and Vincent for violating his constitutional rights, as well as Vincent, in his personal capacity, for defaming him.[2] All of these claims stem from the actions of FAA officials informing persons who allegedly had no official need for the information that an internal agency investigation indicated that Bartel improperly obtained access to airman files of FAA inspectors and may have thereby violated the Privacy Act. Bartel asked for damages resulting from these disclosures, and injunctive relief prohibiting the appellees from further disclosing records pertaining to him.

Pursuant to appellees' motion to dismiss for failure to state a claim upon which relief may be granted, or in the alternative for summary judgment, the district court dismissed all of Bartel's claims. In doing so, it looked beyond the pleadings, *see Bartel v. Federal Aviation Administration*, Civ. No. 82–2791 (Nov. 30, 1982) (order dismissing action); we therefore treat the court's order as a grant of summary judgment. *See* Fed.R.Civ.P. 12(b). Because we find that Bartel's complaint states causes of action upon which relief might be granted, and that there are issues of material fact remaining with respect to those claims, we vacate the district court's dismissal of his claims and remand for proceedings consistent with this opinion.

1. Bartel was represented by counsel on his appeal.

2. Although there is no federal cause of action for defamation, a federal court may exercise pendent jurisdiction over a state defamation claim if that claim is a separate but parallel ground for relief sought in a federal claim. *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). In Bartel's complaint, many of the operative facts giving rise to the constitutional claims against Vincent are identical to those upon which Bartel's defamation claim rests, and those constitutional claims are clearly not mere "appendages" to a state law claim that comprised "the real body

## I. Background

Until January, 1979, Bartel worked as an FAA air safety inspector. In 1978, he was actively considering filing an Equal Employment Opportunity (EEO) complaint on the grounds of reverse discrimination. For that purpose he claims to have requested "flight times and ratings" of several fellow FAA inspectors from the FAA Airmen Certification Branch. Statement of Genuine Issues in Opposition to Defendants' Motions for Dismissal and Summary Judgment 1–2 [hereinafter cited as Plaintiff's Statement], *reprinted in* Plaintiff's Appendix at 58 [hereinafter cited as App.]. Before requesting the times and ratings, Bartel asserts that he asked the FAA Aeronautical Center if such information was public and was assured it was. *Id.* at 3, *reprinted in* App. at 58; *see also* Plaintiff's Exhibit B, *reprinted in* App. at 101 (letter from Aeronautical Center Counsel stating that information will be released to the public). The information he obtained, however, consisted of virtually complete airman files of three of his fellow FAA inspectors. These files contained both public and non-public information.

On August 2, 1978, Bartel filed a complaint with the FAA EEO office. Complaint ¶ 7, *reprinted in* App. at 6. The next day appellee Vincent, Chief of the FAA Eastern Region Flight Standards Division, requested an investigation concerning an apparent violation of the Privacy Act by Bartel. Documents collected pursuant to that investigation were placed in a Report of Investigation (ROI). The investigation

of the case." *Id.* at 727, 86 S.Ct. at 1139–1140. Hence, in this case federal jurisdiction over the defamation claim could properly be invoked. We leave it to the district court to determine on remand if the operative facts sufficiently overlap to justify exercising pendent jurisdiction. *See Hamman v. Southwestern Gas Pipeline, Inc.*, 721 F.2d 140 (5th Cir.1983) (remanding on question of jurisdiction because "the decision to exercise pendent jurisdiction is within the discretion of the trial judge"); *see also Doe v. Bd. on Prof. Responsibility*, 717 F.2d 1424, 1427–28 (D.C.Cir.1983) (district court has discretion to decide whether to exercise pendent jurisdiction).

was closed in December, 1978, after the United States Attorney declined prosecution in favor of administrative action by the FAA. In January, 1979, Vincent decided that a letter of reprimand to Bartel was appropriate. No such letter was ever issued, however, because according to the appellees, in January, 1979, Bartel left the FAA's employ to work with the International Civil Aviation Organization in Canada for an expected three year tour of duty. Statement of Material Facts as to Which There Is No Issue, in Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment 1–2 [hereinafter cited as Defendants' Statement], *reprinted in* App. at 25–26. Thus, Bartel was never presented with any official adverse action as a result of the investigation to which he could formally respond.

In late 1979, Vincent learned that Bartel was seeking reemployment with the FAA. After discussing the earlier investigation with the FAA Personnel Division and Regional Counsel, Vincent sent letters to the three inspectors whose airman files had been sent to Bartel. *See* Defendants' Statement at 2, *reprinted in* App. at 26. These letters contained Bartel's name and place of work, along with lists of records Bartel had received about other airmen as a result of his request for information. *See* Defendants' Exhibit I, *reprinted in* App. at 176. The letters also stated that "an investigation conducted by the Air Transportation Security Division, AEA–700, indicates that Mr. Richard C. Bartel while in the capacity of an Aviation Safety Inspector . . . improperly obtained records pertaining to you." *Id.* The letters went on to state: "Since his actions appear to constitute a violation of the Privacy Act, we are informing you of this incident." *Id.*

In April, 1980, Bartel interviewed with the FAA, Southern Region, for a job for which he had already been determined to be "a best qualified candidate." At the interview Bartel alleges that he was informed that he would not be hired because of the letter Vincent sent to one FAA inspector, Linda Barber, which the interviewer had heard about from another FAA employee. Complaint ¶ 19, *reprinted in* App. at 8. At about the same time, Bartel applied to work at Flight Resources, Inc., of Washington, D.C. An investigator for Flight Resources spoke over the phone with Vincent and Robert Cheshire, a subordinate of Vincent, about Bartel. Vincent told the investigator that the FAA was looking into a job-related problem that Bartel had when he left the Administration. Defendants' Exhibit M, *reprinted in* App. at 187. Cheshire told the investigator that Bartel requested records for use in filing an EEO complaint, and that the FAA had proposed disciplinary action against him. *Id.* Bartel was not selected for either the FAA or the Flight Resources job. Later Bartel was hired by the FAA for a temporary GS–12 position, despite the fact that he was qualified for a permanent GS–13 position that was open at the same time.

Bartel, proceeding *pro se,* filed a complaint in district court alleging that the Vincent letters and the Vincent and Cheshire telephone conversations constituted prohibited nonconsensual disclosures of information about him in violation of the Privacy Act. He also alleged that the damaging disclosures marred his reputation and prevented him from obtaining employment, in particular that they denied him access to government employment without due process. His complaint may also be read to raise claims, explicitly raised on appeal, that the disclosures were in retaliation for filing his EEO complaint and thus in violation of the first amendment,[3] *see* Complaint

---

**3.** The appellees point out that Bartel's complaint never mentions "retaliation." It does state, however, that the Merit Systems Protection Board found that Vincent's conduct was a "statutorily prohibited personnel practice." Complaint at 7, *reprinted in* App. at 11, and generally alleges a first amendment violation. *Id.* at 1, *reprinted in* App. at 5. The crux of the

Board's determination was that Vincent retaliated against Bartel for filing his EEO complaint. *See Bartel v. Federal Aviation Administration, Merit Systems Protection Board No. PH03538010219,* slip op. at 12 (Nov. 22, 1982) [hereinafter cited as MSPB *Opinion* ], *reprinted in* App. at 96. We think this cross reference was sufficient to apprise the government of a

¶¶ 28–30, *reprinted in* App. at 9–10, and that they were false, flagrantly derogatory, and therefore defamatory. *See* Complaint ¶ 48, *reprinted in* App. at 12. In a separate complaint alleging identical facts, Bartel alleged that the disclosures gave rise to a tort action under the Federal Torts Claims Act (FTCA). *See* App. at 14.

The district court dismissed all the claims in a brief order. It said that Bartel "had used his official position to invade the privacy of fellow employees" and continued: "As a result of his misconduct, these employees were denied the accounting of disclosure to which they were entitled under the Privacy Act. . . . That being the basic situation, plaintiff's complaint stands the Privacy Act on its head." *Bartel v. FAA,* Civ. No. 82–2791 (Nov. 30, 1982) (order dismissing complaint). The order also dismissed Bartel's due process claim, citing *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). The order did not deal with any of the other jurisdictional bases for Bartel's complaints.[4] Moreover, the record is sparse because Bartel's claims were dismissed before any discovery was taken. A careful examination of the pleadings and the supplemental filings in this case, however, lead us to conclude that Bartel alleged several valid causes of action about which genuine issues of material fact existed sufficient to preclude the district court's grant of summary judgment in favor of appellees. We therefore remand for further proceedings consistent with our analysis of the case.

---

pro se plaintiff's claim of retaliation, and therefore that the complaint may properly be read to raise such a claim.

**4.** Because Bartel was proceeding *pro se* when he filed his complaints, we construe them liberally. *See Boag v. MacDougall,* 454 U.S. 364, 365, 102 S.Ct. 700, 701, 70 L.Ed.2d 551 (1982); *Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

**5.** *See* 5 U.S.C. § 552a(d) (allowing access and requests for amendment of personal records).

**6.** *See* 5 U.S.C. § 552a(e).

**7.** Under the heading, "Agency requirements," the Act further provides:

## II. PRIVACY ACT

The Privacy Act safeguards the public from unwarranted collection, maintenance, use and dissemination of personal information contained in agency records. It does so by allowing an individual to participate in ensuring that his records are accurate and properly used,[5] and by imposing responsibilities on federal agencies to maintain their records accurately.[6] The subsection of the Act addressing the wrongful disclosure of information, which is the gravamen of Bartel's Privacy Act claim, provides:

> No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains.

5 U.S.C. § 552a(b).[7]

### A. Disclosure of a "Record"

The appellees contend that this statutory provision does not apply to the letters to which Bartel objects because the information they contained was not physically retrieved from the ROI by Vincent, but rather came from his independent knowledge of the investigation and its results.[8] *See* Brief for Appellees, at 15. Therefore, appellees argue, the letters were not disclosures of "records" within the meaning of the Act, but rather were only disclosures of information within Vincent's personal knowledge. *Id.* at 13.

The Act defines "record" as:

> Each agency that maintains a system of records shall—
> . . . .
> (6) prior to disseminating any record about an individual to any person other than an agency, make reasonable efforts to assure that such records are accurate, complete, timely, and relevant for agency purposes.

5 U.S.C. § 552a(e). At oral argument, counsel for Bartel stated that this accuracy provision is irrelevant to Bartel's claim. Hence, we do not consider if the disclosures, in addition to being nonconsensual, were sufficiently inaccurate or incomplete to violate paragraph (e)(6).

**8.** We discuss the phone conversations separately, *infra* p. 1414.

any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, his education, financial transactions, medical history, and criminal or employment history and that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual, such as a finger or voice print or photograph.

5 U.S.C. § 552a(a)(4).[9] It is of course obvious that the letters were not themselves agency records. On the other hand, it is not disputed that the Bartel ROI referred to in the letters is a record subject to the disclosure provisions of the Act.[10] Because we find that under the peculiar circumstances of this case, the letters did in fact communicate sensitive information contained in the ROI—specifically, that Bartel's conduct was the subject of an official agency investigation, that he acted improperly, and that he may have violated the Privacy Act—we conclude that the Act's disclosure protections may have been triggered.

Courts up to now have unanimously agreed that the Act covers more than the mere physical dissemination of records (or copies) but that it does not necessarily cover disclosure of information merely because the information happens to be contained in the records. The line they draw is that where no statutory exception applies, the Act prohibits nonconsensual disclosure of any information that has been retrieved from a protected record. *See, e.g., Thomas v. United States Department of Energy,* 719 F.2d 342 (10th Cir.1983); *Jackson v. Veterans Administration,* 503 F.Supp. 653, 656 (N.D.Ill.1980); *Savarese v. United States Department of Health, Education and Welfare,* 479 F.Supp. 304, 307 (N.D.Ga. 1979), *aff'd mem. sub nom. Savarese v. Harris,* 620 F.2d 298 (5th Cir.1980), *cert. denied,* 449 U.S. 1078, 101 S.Ct. 858, 66 L.Ed.2d 801 (1981). The appellees urge that this line would require an affirmance of the dismissal of Bartel's Privacy Act claim.

We find the appellees' position problematic for two reasons. First, even if we adopted the view that the Act covers only information physically retrieved from a record, there would still be a material issue of fact on the evidence before us as to whether Vincent gained the information disclosed in his letters by reading the ROI. The record of this case is entirely silent as to whether Vincent ever examined the ROI. Rather than specifically assert, by way of affidavits or otherwise, that he did not examine it, the appellees instead argue that Vincent's letters merely "render ... 'a conclusory statement from [his] memory.'"

9. The statutory definition of the term "record" represents a compromise between the Senate bill, which covered all "personal information," and the House version which applied only to "any collection or grouping of information about an individual." H.R. 16373 as reported from the Committee on Government Operations, *reprinted in* Senate Committee on Government Operations & House Committee on Government Operations, Subcommittee on Government Information and Individual Rights, Legislative History of the Privacy Act of 1974 S3418 (Public Law 93–579): Source Book on Privacy 278 (1976) [hereinafter cited as Source Book]. The final definition was formulated to "assure ... that a record can include as little as one descriptive item about an individual .... The amended definition was adopted to more closely reflect the definition of 'personal information' as used in the Senate bill." 120 Cong.Rec. 40408 (Analysis of House and Senate Compromise Amendments to the Federal Privacy Act, requested to be printed in the record by bill sponsor Sen. Ervin), *reprinted in* Source Book, *supra,* at 866. According to the Office of Management and Budget, which is responsible for promulgating guidelines for interpretation and enforcement of the Act, the term "record" is limited to "a tangible or documentary record (as opposed to a record contained in someone's memory)." Office of Management and Budget, Guidelines for Implementing Section 552a of Title 5 of the United States Code 12 (July 1, 1975) [hereinafter OMB Guidelines], *reprinted in* Source Book, *supra,* at 1026.

10. The Act's requirement that an agency obtain a subject's consent before disclosing a "record" about him covers only records included in a "system of records." *See* 5 U.S.C. § 552a(b). To be in a system of records, a record must be under the agency's control, and, in practice, retrieved by an individual's name or other personal identifier. *See* 5 U.S.C. § 552a(a)(5); OMB Guidelines, *supra* note 9, at 13; *reprinted in* Source Book, *supra* note 9, at 1027.

Brief for Appellees, at 14 (quoting *Doyle v. Behan*, 670 F.2d 535, 539 (5th Cir.1982)). The appellees, however, omit from the quoted passage its explicit recognition that the district court in *Doyle* had found "a system of records had not been utilized ... to gather the information conveyed." *Doyle*, 670 F.2d at 639. Here, on the other hand, we know only that Vincent made a determination based on the investigation that Bartel should be officially reprimanded. Instead of reprimanding Bartel, who was no longer an FAA employee, he decided the best course of action was to inform those whose files were disclosed of Bartel's improper conduct, in effect, disclosing a summary of the ROI. We do not know if Vincent ever consulted the file and, if so, when, in relation to the sending of the letters. Thus, we find it far from clear that what the appellees call a "conclusory statement," reporting that Bartel acted improperly and may have violated the Privacy Act, did not in fact constitute information Vincent derived from reading the ROI. At the least, it is a matter requiring further development of the facts.

In addition, we disagree with appellees that all information not "retrieved" from a record is "personal knowledge" falling outside of the Privacy Act's protection. Although they cite several cases from other circuits to support their position,[11] none involved the peculiar set of circumstances present here: disclosure by an agency official of his official determination made on the basis of an investigation which generated a protected personnel record. For example, in *Jackson*, 503 F.Supp. 653, the court explicitly found that "the official alleged to have divulged protected information had knowledge of the facts disclosed *independent* of any record in the plaintiff's OPF [personnel file] or elsewhere." *Id.* at 656 (emphasis supplied). More importantly, this case demonstrates that an absolute policy of limiting the Act's coverage to information physically retrieved from a record would make little sense in terms of its underlying

purpose. Nor does the Act's language require such a hypertechnical interpretation. The Privacy Act forbids nonconsensual disclosure of records "by any means of communication," 5 U.S.C. § 552a(b), and it requires that where disclosure is permitted, it must be accurate and complete. 5 U.S.C. § 552a(e)(6). Under the appellees' suggested standard, an official could circumvent both requirements with respect to a record he himself initiated by simply not reviewing it before reporting its contents or conclusions. Ironically, the Act would prohibit dissemination where such an official reviews a record in order to ensure the accuracy of a disclosure, but inadvertently mischaracterizes it, yet would immunize dissemination of the same inaccurate information if the official did not even bother to check the disclosure against the record. Thus, a rigid adherence to the "retrieval standard" makes little sense *in this case,* whatever its merits as a guideline in other Privacy Act situations.

Therefore, despite dicta from other circuits, we decline to rule, *in the factual context of this case,* that the Act's coverage is restricted to information directly retrieved from a tangible recording. The most commonly cited dicta of this genre is found in *Savarese*, 479 F.Supp. 304, and was explicitly premised on the conclusion that:

> Congress had as its purpose the control of the unbridled use of highly sophisticated and centralized information collecting technology. The capacity of computers and related systems to collect and distribute great masses of personal information clearly poses a threat that the Privacy Act seeks to remedy. That problem is not, however, present in this action. On the contrary, there was no utilization whatsoever of such an information system to retrieve the information at issue in this case.

*Id.* at 308. It was also premised, in part, on the concern that "[t]he interpretation con-

**11.** They cite: *Doyle*, 670 F.2d at 539; *Jackson*, 503 F.Supp. at 656; *Savarese*, 479 F.Supp. at 307. Other cases with similar holdings and dicta are: *Thomas*, 719 F.2d 342; *Olberding v. United States Dep't of Defense*, 709 F.2d 621 (8th Cir.1983) (per curiam).

tended for . . .—that section 552a(b) is violated if agency personnel disclose information they possess by means other than retrieval from a system of records if they know or have reason to believe that the information may also be found in a record within a system of records—would create an intolerable burden." *Olberding v. United States Department of Defense,* 709 F.2d 621, 622 (8th Cir.1983). We assume the "intolerable burden" refers primarily to situations, unlike this one, where information was inadvertently leaked from a record, became part of general office knowledge, and some time later was disclosed purportedly as a matter within the discloser's personal knowledge.

We do not take issue with the importance of either concern in the interpretation of the Act. But, neither do we think those rationales support reading out of the Act's coverage the situation we may be dealing with here, where an agency official uses the government's "sophisticated . . . information collecting" methods to acquire personal information for inclusion in a record and then discloses that information in an unauthorized fashion without actually physically retrieving it from the record system. Threats to privacy from the government's recordkeeping emanate not only from the ease of retrieval, but also from the ease of collection and utilization of vast amounts of personal information.[12] Given this broad lens view of privacy protection which Con-

**12.** Senator Ervin, a sponsor of the Privacy Act, emphasized the Act's concern over the government's collection and use of information in a Senate speech on June 11, 1974, quoted in a later Senate report on privacy. He remarked:

It is a rare person who has escaped the quest of modern government for information. Complaints which have come to the Constitutional Rights Subcommittee and to Congress over the course of several administrations show that this is a bipartisan issue which effects [sic] people in all walks of life. The complaints have shown that despite our reverence for the constitutional principles of limited Government and freedom of the individual, Government is in danger of tilting the scales against those concepts by means of its information-gathering tactics and its technical capacity to store and distribute information. When this quite natural tendency of Government to acquire and keep and share information about citizens is enhanced by computer technology and when it is subjected to the unrestrained motives of countless political administrators, the resulting threat to individual privacy make [sic] it necessary for Congress to reaffirm the principle of limited, responsive Government on behalf of freedom.

The complaints show that many Americans are more concerned than ever before about what might be in their records because Government has abused, and may abuse, its power to investigate and store information.
. . . .
They are concerned about intrusive statistical questionnaires backed by the sanctions of criminal law or the threat of it because they have been subject to these practices over a number of years.

S.Rep. No. 1183, 93d Cong., 2d Sess. 4 (1974) U.S.Code Cong. & Admin.News, pp. 6916, 6919. (Protecting Individual Privacy in Federal Gath-

ering, Use and Disclosure of Information), *reprinted in* Source Book, *supra* note 9, at 157. The Report went on to note:

studies show that thousands of questionnaires are sent out yearly asking personal questions, but people are not told their responses are voluntary; many think criminal penalties attach to them; it is difficult for them to find out what legal penalties attach to a denial of the information or what will be done with it. If they do not respond, reports show that they are subjected to telephone calls, certified follow-up letters, and personal visits.

*Id.* at 12, *reprinted in* Source Book, *supra* note 9, at 165. Finally, the Report summarized the impetus behind the original Senate bill on privacy, stating:

The premise underlying this legislation is that good government and efficient management require that basic principles of privacy, confidentiality and due process must apply to all personal information programs and practices of the Federal Government . . . .

The need for such a general legislative formula is made necessary by the haphazard patterns of information swapping among government agencies, the diversity of confidentiality rules and the unevenness of their application within and among agencies. The lack of self-restraint in information-gathering from and about citizens on the part of some agencies has demonstrated the potential throughout government for imposing coercive information burdens on citizens or for invading areas of thought, belief or personal life which should be beyond the reach of the Federal data collector.

*Id.* at 16, *reprinted in* Source Book, *supra* note 9, at 169.

gress embraced,[13] the *Savarese* rationale is consistent with extension of the Act's prohibition to nonconsensual disclosure of information as closely connected to the "maintenance"[14] of a record as the situation here suggests, even absent physical retrieval from a tangible recording. And, in contrast to disclosures of general office knowledge, it would hardly seem an "intolerable burden" to restrict an agency official's discretion to disclose information in a record that he may not have read but that he had a primary role in creating and using, where it was because of that record-related role that he acquired the information in the first place. Indeed, a different interpretation would deprive the Act of all meaningful protection of privacy.[15]

In this case, the details of Vincent's precise relationship to the creation and use of the Bartel investigation record are not fully known. The record before the district court indicates, however, that Vincent ordered the investigation which resulted in the Bartel ROI, made a putative determination of wrongdoing based on the investigation, and disclosed that putative determination in letters purporting to report an official agency determination. Absent additional information, it seems reasonable to infer that only because of Vincent's request for that investigation and his use of it to determine that a reprimand was appropriate, was he able to state in his letter that "an investigation

conducted by the Air Transportation Security Division ... indicates that Mr. Richard Bartel ... improperly obtained records pertaining to you." The bald assertion by the appellees that "[p]lainly, appellee Vincent knew of the possible impropriety of appellant's intrusion long before, and independent of, the formal investigation and the resulting investigative file," *see* Brief for Appellees at 14, is irrelevant. The Vincent letters on their face purport to repeat findings and conclusions made as a result of that investigation. In short, if the facts are as Bartel states, we cannot agree with appellees that the Privacy Act does not cover the sending of these letters because they did not constitute "communication" of a protected "record."

### B. *The FOIA Exception to the Privacy Act Disclosure Provisions*

The appellees next argue that the letters were not disclosures covered by the Privacy Act because they only imparted information that the FAA would have been required to release pursuant to a Freedom of Information Act (FOIA) request. The Privacy Act excepts from its coverage "disclosure of [a] record that would be required under [the FOIA]." 5 U.S.C. 552a(b)(2). The appellees state that the information disclosed in the Vincent letters "clearly could not be withheld under Exemption 6 of

---

**13.** The panoramic scope which Congress adopted in passing the Privacy Act is most evident in the preamble to the Act itself, which states:

> [A] purpose of this Act is to provide certain safeguards for an individual against an invasion of personal privacy by requiring Federal agencies, except as otherwise provided by law, to—

> . . . . .

> collect, maintain, use, or disseminate any record of identifiable personal information in a manner that assures that such action is for a necessary and lawful purpose, that the information is current and accurate for its intended use, and that adequate safeguards are provided to prevent misuse of such information.

Pub.L. No. 93–579, § 2(b)(4) 88 Stat. 1896 (1974), *reprinted in* Source Book, *supra* note 9, at 501.

**14.** We use the term maintenance in the broad sense of the Act to "include ... maintain, collect, use, or disseminate." 5 U.S.C. § 552a(a)(3).

**15.** Restricting the Act's coverage to disclosure of information retrieved from the record would allow, for example, an agency investigator who, in the process of making a record, learned of some information damaging to an individual to make public that information without violating the Act. This contravenes the explicit Congressional "design ... to prevent ... interbureau leaks of information about persons of interest in the agency or community, or such actions as the publicizing of information of a sensational or salacious nature or of that detrimental to character or reputation." S.Rep. No. 1183, 93d Cong., 2d Sess. 51 (1974), U.S.Code Cong. & Admin.News, p. 6966 *reprinted in* Source Book, *supra* note 9, at 204.

the FOIA," which they contend is the only exemption relevant in this case.[16]

First and foremost, the letters were not sent in response to a FOIA request. Nonetheless, appellees interpret section 552a(b)(2) to allow unrestricted disclosure unless the information falls within a FOIA exemption, whether or not the information has been requested. The only reported case squarely on point rejects this interpretation. *See Zeller v. United States*, 467 F.Supp. 487, 503 (E.D.N.Y.1979) (FOIA exception to Privacy Act does not apply because "nothing in the FOIA appears to require such information to be released in the absence of a request therefor"). The cases upon which appellees rely are not apposite since they all involved Privacy Act claims to prevent disclosure in the face of an actual FOIA request. *See, e.g., Brown v. Federal Bureau of Investigation*, 658 F.2d 71, 74 (2d Cir. 1981); *Providence Journal Company v. Federal Bureau of Investigation*, 460 F.Supp. 762 (D.R.I.1978), *rev'd on other grounds*, 602 F.2d 1010 (1st Cir.1979), *cert. denied*, 444 U.S. 1071, 100 S.Ct. 1015, 62 L.Ed.2d 752 (1980). In fact, one of them says

> [t]he excepting of material required to be disclosed under FOIA from the operation of the § 552a(b) permission requirement does not include discretionary decisions to disclose.

*Providence Journal*, 460 F.Supp. at 762; *see also Plain Dealer Publishing Co. v. United States Department of Labor*, 471 F.Supp. 1023, 1030 (D.D.C.1979) ("[t]he net effect of [§ 552a(b)(2) ] is to permit disclosure where the FOIA requires it, but to prohibit disclosure where the FOIA allows the agency to refuse to disclose").

Although the language of section 552a(b)(2) standing alone may be subject to different interpretations, we think that, in light of the differing thrusts of the FOIA and the Privacy Act, it must be read generally to preclude nonconsensual disclosure of Privacy Act material unless the agency acts pursuant to a FOIA request. Our reasoning is quite simple. The FOIA was meant to limit agency discretion to deny public access to information in its files. *GTE Sylvania, Inc. v. Consumers Union*, 445 U.S. 375, 385, 100 S.Ct. 1194, 1201, 63 L.Ed.2d 467 (1980). The Privacy Act, on the other hand, was designed to limit agency discretion to reveal personal information in its files. *See generally* Preamble to Privacy Act, Pub.L. No. 93–579, § 2(b), 88 Stat. 1896 (1974). Although there are undoubtedly areas of potential overlap and even conflict, *see Greentree v. United States Customs Service*, 674 F.2d 74, 78 (D.C.Cir. 1982), certainly it is fair to say neither statute was passed to increase agency discretion as to what to disclose or hold back. It would be unreasonable to read the FOIA, as appellees do, as *increasing agency discretion* to disclose information where disclosure is otherwise prohibited by the Privacy Act.[17] Only when the agency is faced with a FOIA request for information that is not within a FOIA exemption, and therefore has no discretion but to disclose the information, does the FOIA exception to the Privacy Act come into play.

Although this reasoning by itself is persuasive, we note that it is also supported by the Office of Management and Budget Guidelines on the Privacy Act, which state:

> Given the use of the term "required," agencies may not voluntarily make. public any record which they are not required to

**16.** Exemption 6 reads in full:
  This section [of the FOIA] does not apply to matters that are ... personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.
  5 U.S.C. § 552(b)(6). Bartel did not take issue with the appellees' contention that no other FOIA exemption applies.

**17.** We note that there is an inconsistency between the reading of section 552a(b)(2) appel-

lees urge here and the one they urge when arguing that Bartel's access to information was unauthorized. *See* Brief for Appellees at 10–12. In the latter they stress that Bartel's access was improper, and that it may have violated the Privacy Act, because he did not make a FOIA request. Thus, they implicitly recognize that disclosure of information required to be released pursuant to a FOIA request may violate the Privacy Act if it is voluntarily released without such a request.

release (i.e. those that they are permitted to withhold) without the consent of the individual . . . .

Records which have traditionally been considered to be in the public domain and are required to be disclosed to the public, such as many final orders and opinions of quasi-judicial agencies, press releases, etc. may be released under this provision without waiting for a specific Freedom of Information Act request. . . . Records which the agency would elect to disclose (i.e., they are permitted to be withheld under the FOIA) may only be released to the public under the "routine use" provision.

OMB Guidelines, *supra* note 9, at 21–22, *reprinted in* Source Book, *supra* note 9, at 1035–36. The legislative history of the Privacy Act lends additional support to our interpretation. When Senate Bill 3418 was first introduced, section 202(c) read: "[the disclosure provisions of the Bill] shall not apply when disclosure would be required *or permitted* pursuant to . . . the Freedom of Information Act of 1966." S. 3418 as reported from the Committee on Government Operations, *reprinted in* Source Book, *supra* note 9, at 139 (emphasis supplied). Despite this language, the accompanying committee report clarified that:

The Committee does not intend agencies to use the Freedom of Information Act as an excuse to avoid their obligations under this section to obtain informed consent.

S.Rep. 93–1183, 93d Cong., 2d Sess. 71 (1974), U.S.Code Cong. & Admin.News, p. 6985, *reprinted in* Source Book, *supra* note 9, at 224. Obviously, Congress was aware of the danger that too broad an FOIA exception could undercut the Privacy Act's protections. Unlike the Senate Bill, the House version contained no FOIA exception. *See* 120 Cong.Rec. 40406 (1974) (Analysis of House and Senate Compromise Amendments), *reprinted in* Source Book, *supra* note 9, at 861. Significantly for this case, the final compromise version of the Act contained an FOIA exception, but limited it to those disclosures *required,* and not to all those *permitted,* under the FOIA.[18] *Id.*

The OMB Guidelines suggest a possible exception to this interpretation for information that is traditionally released by an agency to the public without an FOIA request. We need not decide whether such an exception is proper, or if so what its exact scope may be. It is clear that the Vincent letters are not such traditional disseminations. We thus find no merit in the appellees' contentions that section 552a(b)(2) (the FOIA exception) permitted sending the letters.

C. *The Letters As Accountings of Disclosures of Airman Files*

The appellees argue that, even if the letters are disclosures covered by the Privacy Act, they do not violate the Act because they were accountings required by the Act itself. Under the Act

[e]ach agency, with respect to each system of records under its control shall—

(1) . . . keep an accurate accounting of—

(A) the date, nature, and purpose of each disclosure of a record to any person or to another agency . . .

(B) the name and address of the person or agency to whom the disclosure is made; [and]

. . . .

(3) . . . make the accounting under paragraph (1) of this subsection available

---

**18.** The final compromise on the FOIA exception was explicitly reviewed in the Analysis of House and Senate Compromise Amendments, which concluded:

The compromise amendment would add an additional condition of disclosure to the House bill which prohibits disclosure without written request of an individual unless disclosure of the record would be pursuant to Section 552 of the Freedom of Information Act. This compromise is designed to preserve the status quo as interpreted by the courts regarding the disclosure of personal information under that section.

120 Cong.Rec. 40406 (1974), *reprinted in* Source Book, *supra* note 9, at 861 (emphasis added). The phrase "pursuant to . . . the Freedom of Information Act" adds further credence to the construction that the exception is invoked only when the agency acts pursuant to a FOIA request.

to the individual named in the record at his request.

5 U.S.C. § 552a(c). Bartel responds that the Act only prescribes dissemination of accountings upon request by the inspectors whose files he obtained, and that the FAA's *sua sponte* decision to send the letters was thus not required.

In this case, however, we need not decide if *sua sponte* dissemination of accountings is permitted by the Act or if so under what conditions. Even if we agreed with the appellees that the *sua sponte* action of the FAA in informing individuals that their files have been wrongfully disclosed—to the extent of revealing the person to whom they were disclosed and the purpose of the disclosure—does not violate the Act, we cannot dismiss Bartel's claim on that ground. The recipients of the Vincent letters were statutorily entitled at most to an accurate accounting provided for by the Act. 5 U.S.C. § 552a(c). The Vincent letters, however, divulge more than the statutory prescribed name, address and reason for disclosure of the airman files. They indicate the fact that Bartel was investigated, that the investigation led to some determination of impropriety, and even that Bartel may have acted criminally in gaining access to the addressees' airman files.[19] Therefore we reject the appellees' attempts to characterize them as mere accountings of disclosures provided for by the Act.

### D. *The Phone Conversations As Disclosures of Records*

Although the Vincent and Cheshire phone conversations involve different factual situations from the Vincent letters, a resolution of whether they constitute disclosures of records under the Privacy Act requires an analysis similar to but in some respects simpler than the one we have applied to the letters. Since the conversations were not held with persons whose files were revealed to Bartel, they could not be considered accountings provided for by section 552a(c). Other than this, we know less about the phone conversations than about the letters: While there are copies of letters in the record, there are no transcripts of the phone conversations, and the record is equally silent about the context within which those conversations occurred or precisely what was said. Thus, we remand to the district court for an initial decision on the mixed fact-law question of whether the phone conversations were disclosures of records under the Privacy Act.

### III. DUE PROCESS CLAIM

■ Bartel sued Vincent, in his personal capacity,[20] for intentionally denying him due process when Vincent made and disclosed the "determination" of wrongdoing, thereby besmirching Bartel's reputation, and then used that determination as a reason to deny Bartel a job at the level commensurate with his experience and qualifications. Bartel recognizes that neither denial of a government job by itself nor wrongful dissemination of information which results in injury to reputation alone infringes interests protected by the due process clause. He claims, however, that when

---

**19.** The Privacy Act includes criminal sanctions for wrongfully gaining access to a record. Among those sanctions, it provides:

Any person who knowingly and willfully requests or obtains any record concerning an individual under false pretenses shall be guilty of a misdemeanor and fined not more than $5000.

5 U.S.C. § 552a(i)(3).

**20.** Bartel may maintain an action against Vincent, in his personal capacity, under *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). The government is shielded from suit for monetary

damages, however, by sovereign immunity. Bartel cannot sue the United States or Vincent in his official capacity for damages resulting from violations of his due process rights since the due process clause does not create a government obligation from which "it naturally follows that the Government should be liable in damages for a breach of its duties." *United States v. Mitchell,* —— U.S. ——, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983); *see also United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 953–954, 47 L.Ed.2d 114 (1976); *Doe v. United States Civil Service Commission,* 483 F.Supp. 539, 562 & n. 19 (S.D.N.Y.1980).

the two are combined, a protected interest is infringed. The district court disagreed, stating simply that under *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), Bartel did not state a compensable constitutional claim.

We agree that *Paul v. Davis* is controlling precedent in this suit, but we read that case differently from the district court. Where the government injures a person's reputation and in so doing effects "a removal, extinguishment, or significant alteration of an interest recognized and protected by . . . law," it must give the person his procedural due. *Mosrie v. Barry,* 718 F.2d 1151 (D.C. Cir.1983). *See also, e.g., Wisconsin v. Costantineau,* 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971) (posting that person is an "excessive drinker," thereby depriving her of the right to purchase alcoholic beverages, deprives her of "liberty" for purposes of due process); *Conset Corp. v. Community Services Administration,* 655 F.2d 1291 (D.C.Cir.1981) (due process guarantees apply to memorandum calling into question integrity, honesty or business reputation where it effectively denies contractor all government contract work); *Old Dominion Dairy Products, Inc. v. Secretary of Defense,* 631 F.2d 953 (D.C.Cir.1980) (same). After reviewing Bartel's complaint, we disagree with the district court's conclusion that it alleges no compensable due process violation.

█ The complaint states that Bartel was denied a specific government job because of the Vincent letter to Barber. It further states that he was denied his (legally cognizable) right to reemployment with the FAA at the GS–13 level: He was rehired only in a temporary GS–12 position. The crux of the complaint, as we read it, is that Bartel was not considered for FAA employment on a basis equal with others of equivalent skill and experience—*i.e.,* that he

was wrongfully denied the "right to be considered for government [employment] in common with all other persons." *Mosrie,* 718 F.2d at 1161. For an individual whose entire career revolved around aviation, this denial may have effectively abridged his freedom to take advantage of public employment. *See Old Dominion,* 631 F.2d at 964. Moreover, the refusal of the FAA, Southern Division to hire Bartel for the same reasons despite his "best qualified" rating may itself have effectively extinguished a legally recognized and protected interest.

We thus remand for the district court to ascertain whether conduct of FAA officials denied Bartel a legally recognized interest, and if so, whether he was given his procedural due. In doing so, we realize that Bartel's due process claims to some extent may be based on wrongs for which he has already sought redress before the Merit Systems Protection Board. The administrative scheme which Congress established to protect civil servants' rights preempts a constitutional claim for damages based on conduct remediable under that scheme. *See Bush v. Lucas,* —— U.S. ——, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983). The district court, however, must entertain Bartel's due process claims for damages attributable to wrongful conduct for which that scheme provides no remedy, along with those for injunctive relief.[21] *Bush,* 103 S.Ct. at 2418 (Marshall, J., concurring) ("nothing in the decision . . . foreclose[s] a federal employee from pursuing a *Bivens* remedy where his injury is not attributable to personnel actions which may be remedied under the federal statutory scheme").

Bartel claims, in addition, that the phone conversations with the investigator from Flight Resources also gave rise to a due process violation. Under the law in this circuit, that is not the case. *See Mosrie,* 718

---

21. We make no judgment about which, if any, of Bartel's allegations of due process violations survive the holding in *Bush. Bush* was decided after the parties filed their briefs, so that we are without the benefit of their analyses of the preemption of Bartel's claims by the statutory civil service scheme. Rather than speculate solely on the basis of Bartel's *pro se* complaint as to the precise violations of due process he alleges, we think the wiser course of action is for the district court to decide initially the extent to which alleged violations are administratively remediable and hence barred in this case.

F.2d at 1162. Although the conversations may have directly caused him an injury—denial of a job—the decision to deny Bartel the job in the private sector was made by Flight Resources and not by the government. Hence under *Mosrie's* reading of *Paul v. Davis,* these allegations do not state a due process claim. *Mosrie,* 718 F.2d at 1162.

### IV. BARTEL'S OTHER CLAIMS

Bartel raises claims that his first amendment rights were infringed, that Vincent defamed him, and that the letters and telephone calls were an invasion of his privacy actionable under the Federal Torts Claims Act (FTCA). He says these claims were set out in his complaints, but the district court did not address these claims at all in its order of dismissal. Although we believe a liberal construction of his complaints can locate such allegations, the sparsity of the record, compounded by the failure of the district court to address them, prevents us from assessing whether grant of summary judgment for the appellees on these claims was proper. Without sufficient guidance from the present record we have no choice but to remand these claims for the district court to decide their validity initially, on an appropriate record.

### CONCLUSION

For the reasons stated above, we vacate the district court's dismissal of the complaints and remand for further proceedings consistent with this opinion.

*It is so ordered.*