**William L. BALBINOT, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 93–3158.

United States District Court, C.D. Illinois, Springfield Division.

Dec. 30, 1994.

William A. McNutt, Decatur, IL, for plaintiff.

James A. Lewis, Asst. U.S. Atty., Springfield, IL, for defendant.

---

*OPINION*

RICHARD MILLS, District Judge:

FACTS: Balbinot's former commanding officer allegedly made false and derogatory comments about him to fellow service members.

CLAIM: Violation of the Privacy Act of 1974.

DEFENSE: The parties agree the alleged statements were untrue and were not contained in any government document, therefore, no violation of the Act occurred.

RESULT: Summary Judgment for the government.

## I. Background

Balbinot was enlisted in the United States Navy from 1976 to November 1991. From 1980 through 1991 Plaintiff served as a recruiter for the Navy. For at least the last four years of his naval career he was assigned to the Naval Reserve Recruiting Command, Detachment Two, Naval Training Center, Great Lakes, Illinois.

In late summer or early fall of 1990, Chief Petty Officer Balbinot's Officer-in-Charge, Captain Rex Settlemoir [1] became aware of the possibility that CPO Balbinot had misused government vehicles. CAPT Settlemoir ordered an investigation which resulted in findings that Plaintiff had indeed misused government vehicles. During the course of the investigation it was also discovered that Plaintiff may have submitted false travel forms, misused government telephones and possibly been involved in improper enlistments. Working with CAPT Settlemoir's office, the Navy Legal Services Office at Great Lakes determined that some of CPO Balbinot's conduct violated the Uniform Code of Military Justice.

Sometime after the investigation began—but before it concluded—CPO Balbinot was admitted to the Psychiatric ward at the Great Lakes Naval Training Center suffering from chronic depression. He remained hospitalized for approximately seven months.

After CAPT Settlemoir's investigation was complete, a decision was made to proceed to a court-martial. CAPT Settlemoir did not have the authority to convene a court-martial. CPO Balbinot, therefore, was assigned temporary additional duty to Captain Jim Boydston who, as Naval Training Station Commanding Officer, Naval Training Station, Great Lakes, had the authority to convene a court-martial. Under this arrangement CPO Balbinot was still technically under CAPT Settlemoir's command.

Prior to Plaintiff's court-martial, he and his defense counsel entered into a pre-trial agreement with the prosecution. Under this agreement, Plaintiff would plead guilty to several charges. In return, the prosecution agreed to drop several pending charges and also agreed to suspend any sentence that called for a punitive discharge or confinement. On April 17, 1991, Plaintiff plead guilty to the instance of using disrespectful language to two commissioned officers, the instance of disobeying the order of a commissioned officer to complete a leave chit, six specifications of disobeying general regulations by possessing a government vehicle and improperly using government manpower and telecommunication services, and one instance of negligent dereliction of duty. Pursuant to this plea, Plaintiff received a punitive letter of reprimand and was forced to forfeit $500 of pay.

Shortly after Plaintiff's court-martial, the Navy initiated administrative separation proceedings against Plaintiff. Again, CAPT Settlemoir did not have the authority to convene the administrative separation proceedings. CPO Balbinot was again transferred on temporary duty to Commander Boydston for the purpose of convening the administrative separation proceedings. Again, CPO Balbinot remained under CAPT Settlemoir's command. At the conclusion of these proceedings it was recommended that Plaintiff be retained on active duty.

The recommendation of the administrative board was reviewed by the Secretary of the

---

1. At the time of the incidents in question Settlemoir held the rank of Commander. Since that time, Settlemoir has been promoted to the rank

of Captain. For purposes of this opinion, he will be referred to as Captain Settlemoir.

Navy, who had sole authority to approve or disapprove the administrative board's recommendation. The Secretary of the Navy declined to follow the board's recommendation, and ordered Plaintiff to be administratively separated from the Navy. On November 12, 1991, CPO Balbinot was administratively separated from the Navy, his separation characterized as "under honorable conditions (general)."

CAPT Settlemoir had testified at Plaintiff's separation hearing and was aware that the administrative board recommended Plaintiff's retention in the Navy. CAPT Settlemoir was also aware that Captain Boydston, who had convened the administrative separation proceedings, had recommended to the Secretary of the Navy that Plaintiff not be retained in the Navy despite the administrative board's recommendation. In approximately the first week of November 1991, CAPT Settlemoir received a telephone call from a member of the Staff Judge Advocate for the Naval Training Center at Great Lakes informing him that the Secretary of the Navy had separated CPO Balbinot from the Navy. Sometime not long after the phone conversation, CAPT Settlemoir received a copy of the discharge directive from the Bureau of Naval Personnel, and a copy of Plaintiff's separation document a DD Form 214. The DD Form 214 indicated Plaintiff's discharged from the Navy was characterized as "under honorable conditions (general)." The DD Form 214 also indicated that Plaintiff's pay grade at the time of separation was E–7.

On June 2, 1992, CAPT Settlemoir met with two former co-workers of Plaintiff, Petty Officers Gerald W. Turner and Michael A. Cooney, at the Naval & Marine Corps Reserve Center, Rock Island, Illinois. Turner and Cooney, like CPO Balbinot and CAPT Settlemoir, were naval reserve personnel who were recalled to active duty to serve in the Naval Reserve Canvasser Recruiter Program. Employees in this program are contracted annually to remain on active duty and the Navy is under no obligation to renew these contracts. At this meeting CAPT Settlemoir informed Turner and Cooney that their contracts would not be renewed. Also

present at the meeting was Chief Petty Officer Russell Bogar, Turner's and Cooney's immediate superior.

At some point during the meeting CAPT Settlemoir brought up the topic of Plaintiff's administrative separation from the Navy. CAPT Settlemoir claims that he stated: "My reasons for recommending your involuntary separation from active duty relate solely to your marginal performance of duty and disciplinary records, and are in no way connected with [Plaintiff's] administrative separation from active duty," or words to that effect.[2] According to CAPT Settlemoir, he wished to make clear that it was Turner's and Cooney's job performance, and not their association with CPO Balbinot, that led to the decision not to renew their contracts.

Plaintiff claims that at the meeting CAPT Settlemoir told Turner and Cooney that Plaintiff had received a discharge that was characterized as "general, under other than honorable conditions" and that Plaintiff had received a reduction in rank from "E–7" to "E–4." Plaintiff claims that CAPT Settlemoir made these statements in violation of the Privacy Act of 1974, 5 U.S.C. § 552a *et seq.*

Both parties agree any statement that Plaintiff received a discharge characterized as under other than honorable conditions was false. It is undisputed Plaintiff received a discharge characterized as "under honorable conditions (general)." It is also agreed by the parties that any statement that Plaintiff received a reduction in rank was false. It is undisputed Plaintiff's pay grade at the time of his separation from the Navy was E–7.

## II. Summary Judgment

Under Fed.R.Civ.P. 56(c), summary judgment shall be granted if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Black v. Henry Pratt Co.*, 778 F.2d 1278, 1281 (7th Cir.1985). The moving party has the burden of providing proper documentary evidence to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91

2. Sworn Affidavit of Rex W. Settlemoir.

L.Ed.2d 265 (1986). A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Unquestionably, in determining whether a genuine issue of material facts exists, the evidence is to be taken in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials of the pleadings, which demonstrates that there is a genuine issue for trial. *Howland v. Kilquist*, 833 F.2d 639 (7th Cir.1987). "A scintilla of evidence in support of the nonmovant's position is insufficient to successfully oppose summary judgment; 'there must be evidence on which the jury could reasonably find for the [nonmoving party].'" *Brownell v. Figel*, 950 F.2d 1285 (7th Cir. 1991) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986)).

### III. Analysis

The Privacy Act of 1974 states in part: "No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains...." 5 U.S.C. § 552a(b). The Act then lists twelve exceptions to section 552a(b), none of which apply in the instant case. If an agency fails to comply with the requirements of the act "in such a way as to have an adverse effect on an individual, the individual may bring a civil action against the agency...." 5 U.S.C. § 552a(g)(1)(D). Section 552a(g)(4)(A) states: "In any suit brought under the provisions of subsection (g)(1)(C) or (D) of this section in which the court determines that the agency acted in a manner which was intentional or willful, the United States shall be liable to the individual in an amount equal to the sum of—(A) actual damages sustained by the individual as a result of the refusal or failure, but in no case

shall a person entitled to recovery receive less than the sum of $1,000...." A record is defined as

any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, his education, financial transactions, medical history, and criminal or employment history and that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual, such as finger or voice print or a photograph.

Defendant has moved for summary judgment based on several grounds. Defendant's first argument is very simple: even if CAPT Settlemoir made the statements Plaintiff claims he did, those statements were false and therefore the information contained in those statements could not possibly have come from a record contained in a system of records. Since the information in question did not come from a record contained in a system of records, the Act has not been violated.

In response, Plaintiff cites *Bartel v. Federal Aviation Administration*, 725 F.2d 1403 (D.C.Cir.1984) for the proposition that even if the statements made by CAPT Settlemoir were false, CAPT Settlemoir violated the Act by disseminating a mischaracterization of information contained in a record contained in a system of records.

In *Bartel*, the plaintiff worked for the Federal Aviation Administration (FAA). Bartel was considering filing an Equal Employment Opportunity complaint against the FAA for reverse discrimination. *Id.* at 1405. In an effort to gain evidence in support of his claim, Bartel requested information on several other FAA employees from the FAA Airmen Certification Branch. Bartel received extensive information on three fellow employees. Bartel believed the information he received was public information; however, in reality Bartel had received the information in violation of the Privacy Act. *Id.*

Bartel's supervisor, Brian Vincent, discovered Bartel's activities and ordered an investigation to determine if Bartel had violated the Privacy Act. *Id.* The investigation re-

vealed that Bartel had in fact probably violated the Act. Based on the investigation results, Vincent determined that a letter of reprimand to Bartel was appropriate. Before the letter of reprimand was issued, however, Bartel left the FAA and thus no letter was issued. *Id.* at 1406.

About a year later, Vincent learned Bartel was applying for a new position with the FAA. After making this discovery, Vincent sent letters to the three individuals Bartel had received information on informing them that Bartel had received significant information from their personnel files. *Id.* Vincent also indicated that an investigation had been conducted which concluded that Bartel may have violated the Privacy Act. As a result of the letters sent by Vincent, Bartel did not receive any of the FAA jobs for which he had applied.[3]

Bartel brought suit against the FAA and Vincent for violating the Privacy Act along with several other theories not relevant here. Bartel claimed Vincent disseminated information protected by the Privacy Act in the letters sent to the three FAA employees Bartel had obtained information on. The FAA filed a motion to dismiss, claiming Vincent had not retrieved the information contained in the letters from a record contained in a system of records but rather the information had come from Vincent's independent knowledge of the investigation. The district court allowed the FAA's motion, but, the District of Columbia Circuit reversed.

The D.C. Circuit found

> that under the peculiar circumstances of this case, the letters did in fact communicate sensitive information contained in [a protected document]—specifically, that Bartel's conduct was the subject of an official agency investigation, that he acted improperly, and that he may have violated the Privacy Act—we conclude that the Act's disclosure protections may have been triggered.

*Bartel,* 725 F.2d at 1408. The court acknowledged that most courts addressing this issue had held that the Act was only violated if the

person disseminating the information actually physically retrieved the information from a record contained in a system of records. The court went on to find that the record was unclear as to whether Vincent had actually consulted a record contained in a system of records before writing the letters or if the information had come from his general knowledge of the investigation. *Id.*

As additional support for their conclusion, the court stated that the Act could be applied to a "disclosure by an agency official of his official determination made on the basis of an investigation which generated a protected personnel record" even if the agency official had not actually retrieved the information from a record. *Id.* at 1409. If this were not the case, the court said, government officials could disclose a plethora of protected information without violating the Act. *Id.* at 1411 n. 15. Under *Bartel,* therefore, it is possible for a court to find a Privacy Act violation even if the individual disseminating the information did not retrieve the information from a record contained in a system of records.

*Bartel* does not aid Plaintiff's case. The issue in *Bartel* was not whether disseminating false information not appearing in a record contained in a system of records violates the Privacy Act. Rather, the issue in *Bartel* was whether there could be a violation of the Privacy Act without the disseminating individual actually retrieving the information disseminated from a record contained in a system of records. The D.C. Circuit answered this question in the affirmative.

In *Bartel,* the information disclosed by Vincent was true. Furthermore, the information disclosed by Vincent did exist in a record contained in a system of records. In the instant case, the statements allegedly made by CAPT Settlemoir where not true and both parties agree that such information does not appear in any record contained in a system of records.

In essence, Plaintiff's claim is that CAPT Settlemoir did not like Plaintiff and in an effort to humiliate or demean Plaintiff CAPT Settlemoir purposefully lied to Turner and Cooney telling them that Plaintiff had been

---

**3.** Bartel did eventually land a job with the FAA. The position gained, however, was at a lower salary and on a temporary rather than permanent basis.

kicked out of the Navy under other than honorable conditions and received a reduction in pay grade. While these actions may give rise to a slander action, they do not state a violation of the Privacy Act.[4] When enacting the Privacy Act, Congress promulgated the following congressional findings and statement of purpose

> (b) [t]he purpose of this Act ... is to provide certain safeguards for an individual against an invasion of personal privacy by requiring Federal agencies, except as otherwise provided by law, to—

> \* \* \* \* \* \*

> (4) collect, maintain, use, or disseminate any record of identifiable personal information in a manner that assures that such action is for a necessary and lawful purpose, that the information is current and accurate for its intended use, and that adequate safeguards are provided to prevent misuse of such information.

Pub.L. No. 93–579, § 2(b)(4) 88 Stat. 1896 (1974).

It is apparent from this language that the purpose of the Act is to ensure that· the government retains accurate information and that it not disseminate that information in a reckless manner. In the instant case, the Navy maintained accurate records on Plaintiff and CAPT Settlemoir did not disseminate any information maintained in those records.[5] Rather, according to Plaintiff, CAPT Settlemoir made up a story about Plaintiff and told the story to two of Plaintiff's former coworkers. Whatever Plaintiff's remedy is against CAPT Settlemoir—if he has one—it is not provided by the Privacy Act.

Given the Court's ruling on this issue, it is unnecessary to consider the remainder of Defendant's arguments.

*Ergo,* Defendant's motion to reconsider its motion for summary judgment is ALLOWED.

Summary judgment is hereby entered in favor of the United States of America.

CASE CLOSED.

---

4. Plaintiff is barred from bringing a slander action against CAPT Settlemoir by the Federal Tort Claims Act, 28 U.S.C. § 2680(h).

5. It could be argued that CAPT Settlemoir did disseminate protected information when he informed Turner and Cooney that Plaintiff had been administratively separated from the Navy. Both Turner and Cooney claim that prior to their meeting with CAPT Settlemoir they were not aware Plaintiff had been separated from the Navy. However, if a government official has independent knowledge of information that is also contained in a protected record, dissemina-

tion of that information is not a violation of the Privacy Act. *Jackson v. Veteran's Administration,* 503 F.Supp. 653 (N.D.Ill.1980). As the court in *Jackson* stated "it would be impossible to assume that [Plaintiff's officer-in-charge] would not have had independent knowledge of the circumstances of plaintiff's [separation]." *Id.* at 656. To hold that CAPT Settlemoir's statement regarding Plaintiff's separation from the Navy violated the Act would result in an unbearable burden being placed on any government supervisor who lost the services of one of their employees.