James K. OLBERDING, Plaintiff,

v.

UNITED STATES DEPARTMENT OF DEFENSE, DEPARTMENT OF THE ARMY, Defendant.

Civ. No. 79–102–2.

United States District Court, S.D. Iowa, C.D.

June 7, 1982.

As Amended Sept. 7, 1982.

Thomas R. Hronek, Maurer & Terrill, Ames, Iowa, Mark W. Bennett, Babich, Bennett & Nickerson, Des Moines, Iowa, for plaintiff.

Christopher D. Hagen, Asst. U.S. Atty., Des Moines, Iowa, David M. Bullock, Dept. of the Army, DAJA–LTM, Washington, D.C., for defendant.

## MEMORANDUM OPINION AND JUDGMENT ORDER

VIETOR, District Judge.

Plaintiff's complaint as amended alleges that the defendant, through its officers, violated the Privacy Act, 5 U.S.C. § 552a, by disclosing certain information about him contained within records within the meaning of the Privacy Act and therefore protected from disclosure by the Privacy Act. This court's jurisdiction rests on 5 U.S.C. § 552a(g)(1).

Pursuant to a ruling sustaining defendant's motion for separate trials of liability and damage issues, trial on the liability issue was conducted by the court sitting without a jury.

■ Also pending before the court is defendant's renewed motion to dismiss or, in the alternative, for summary judgment. As will become apparent from this memorandum opinion, defendant's renewed motion is probably good and could be sustained, but the court deems it more appropriate to dispose of this case on the merits.[1]

---

1. [A] federal district court has no discretion to *grant* a motion for summary judgment under Rule 56. However, even if a district judge feels that summary judgment in a given case is technically proper, sound judicial policy and the proper exercise of judicial discretion may prompt him to *deny* the motion and permit the case to be developed fully at trial. The ultimate legal rights of the movant can always be protected in the course of or even after trial. *See* 10 C. Wright, A. Miller &

Kane [Federal Practice and Procedure] § 2728, pp. 552 *et seq.* A district judge is frequently tempted in these days of crowded dockets to dispose of a case summarily if he feels that the party opposing a motion for summary judgment cannot prevail legally upon trial. However, this court has cautioned that a district judge in order to dispose of a case summarily should not make the case hard by deciding a difficult or doubtful

## FINDINGS OF FACT

1. The plaintiff, James K. Olberding, is and was at all material times, a United States citizen and a resident of Ames, Iowa.

2. The defendant is a military department and an agency of the United States of America as defined in 5 U.S.C. § 552(e).

3. The plaintiff received a bachelor of science degree from Iowa State University (ISU) at Ames, Iowa, in May of 1963. In June of 1965 he was drafted into the Army, and while serving in Vietnam in 1969 he received a battlefield commission. The plaintiff was promoted to captain in 1973 and, beginning June 5, 1975, he was assigned to the Reserve Officer Training Corps (ROTC) detachment at ISU as an Assistant Professor of Military Science.

4. The ROTC program is administered by the Training and Doctrine Command, Fort Monroe, Virginia. The colleges and universities participating in this program are divided into four regions. The Fourth Region, headquartered at Fort Lewis, Washington, is responsible for the reserve officer training programs in 17 states with 46 colleges and universities. ISU is within the Eastern Area of the Fourth Region.

5. During his assignment to ISU's ROTC detachment, the plaintiff's duties were teaching military science courses and performing administrative tasks within the unit. Except as noted in paragraphs 22, 23 and 24, *infra,* at all material times until June 30, 1977, Captain Olberding's chain of command in ascending order was Lieutenant Colonel Norman H. Morrissette, Professor of Military Science, ISU, Colonel Robert M. Reuter, Commander, Eastern Area, Fourth ROTC Region, and Brigadier General John M. Shea, Commander, Fourth ROTC Region.

6. The ROTC detachment at ISU is a separate academic department within the College of Science and Humanities. The Dean of the College of Science and Humanities at ISU, at all material times, was Dr.

Wallace Russell, whose immediate superior was Dr. George Christenson, Vice President of the University for Academic Affairs. Although the University required certain threshold criteria of those persons assigned by the Army to the ROTC detachment, the University did not exercise the right of hiring or firing ROTC personnel.

7. In March of 1977 General Shea made a routine visit to ISU's ROTC detachment. In the course of this visit, it became apparent to the general that something was amiss. It appeared to the general that there were two factions of cadets—one of the opinion that things were goofed up and one of the opinion that things were going along all right.

8. General Shea's visit was closely followed by an annual inspection by Colonel Reuter who, prior to his visit, was directed by General Shea to find out what was wrong. In the course of Colonel Reuter's inspection, he met with Captain Olberding, who informed him of several problems that he believed existed within the detachment. Colonel Reuter reported to General Shea that there were two polarized factions at each others' throats in the unit.

9. General Shea then detailed his Inspector General, Lieutenant Colonel Rodney C. Winterbottom, to evaluate the climate of leadership within the ROTC detachment at ISU. After his inspection, Colonel Winterbottom reported to General Shea that Captain Olberding was behaving in an unprofessional manner and causing disruption among the cadets.

10. General Shea then ordered Captain Olberding to report to Fort Lewis, Washington, on May 3, 1977, and to bring his medical records with him. This order was relayed to Lieutenant Colonel Morrissette, who informed Captain Olberding of the order. Sergeant Major Jackson may have known about this order.

question of law that might not survive factual determinations. *Robert Johnson Grain Co. v. Chemical Interchange Co.,* 541 F.2d 207, 211 (8th Cir.1979).

*Roberts v. Browning d/b/a Browning, Inc.,* 610 F.2d 528, 536 (8th Cir.1979).

11. On May 3, 1977, Captain Olberding met at Fort Lewis with General Shea, who directed plaintiff to consult with a psychiatrist at Madigan Army Hospital at Fort Lewis. An appointment with the psychiatrist had been previously arranged by General Shea. On the same day a mental status examination of Captain Olberding was conducted by Doctor Ralph R. Green, a practicing psychiatrist and a Lieutenant Colonel in the Army Medical Corps. Captain Olberding cooperated fully. At the conclusion of the examination, Dr. Green advised Captain Olberding that he did not believe he was suffering from any psychiatric disease or disorder. He made some suggestions to Captain Olberding to assist him in improving his work relationships. Further, he advised Captain Olberding that he intended to discuss the substance of the examination with General Shea for his information and action, and Captain Olberding had no objection to that.

12. Following his examination of Captain Olberding, Doctor Green called General Shea and advised him of the examination, including his conclusion that Captain Olberding was not suffering from any mental illness. Dr. Green also advised General Shea of his impressions regarding Captain Olberding's strengths and weaknesses. General Shea was aware that a written report would be prepared based upon the examination and Dr. Green's conclusions.

13. General Shea met with Captain Olberding that same day and informed him that he was to be transferred. (Plaintiff's tour of duty at ISU would normally have ended in June of 1978.)

14. General Shea informed Colonel Reuter of the results of Captain Olberding's psychiatric evaluation and that Captain Olberding was to be transferred.

15. The next day Colonel Reuter informed Lieutenant Colonel Morrissette by telephone that Captain Olberding was to be transferred, and the results of the psychiatric evaluation.

16. On May 4, 1977, General Shea sent a personal message to Brigadier General B.E. Doty, Director of Office Personnel, Military Personnel Center (MILPERCEN), requesting that Captain Olberding be expeditiously reassigned, and on May 20, 1977, General Doty agreed that Captain Olberding would be transferred and reassigned by June 30, 1977.

17. On or about May 10, 1977, Dr. Green prepared a two page written report of mental status evaluation relating to his examination of Captain Olberding on May 3, 1977, and forwarded the original to General Shea. The General forwarded the report to Colonel Reuter, who then furnished the report to the Inspector General. A copy of this report was maintained in the Department of Psychiatry and Neurology clinical files at Madigan Army Medical Center, Tacoma, Washington, under the name of Olberding, James K., where it remained until it was released to plaintiff pursuant to a Freedom of Information Act request.

18. Approximately May 11, 1977, Colonel Morrissette orally informed Dean Russell that Captain Olberding was to be transferred to another location immediately. In the conversation, the Colonel incidentally mentioned that Captain Olberding had been called to Fort Lewis for a psychiatric interview, but he did not mention the results.

19. On May 20, 1977, Captain Olberding submitted his request for relief from active duty, effective November 25, 1977.

20. Inasmuch as General Shea was unwilling to allow Captain Olberding to remain at ISU, Captain Olberding requested that he be reassigned to Camp Dodge, Iowa, as an advisor to the Iowa National Guard. This request was granted and the reassignment became effective June 30, 1977.

21. Following his transfer to Camp Dodge, Captain Olberding continued to live in Ames, continued to be an ISU student, and continued to be in contact with ROTC students regarding the program at ISU.

22. Colonel Morrissette departed ISU on May 14, 1977. He was temporarily replaced by Major Stacy Hart.

23. On June 21, 1977, Lieutenant Colonel Rex Frazer became the Professor of

Military Science, although he had originally been scheduled to arrive July 1, 1977.

24. Lieutenant Colonel Frazer was in Captain Olberding's direct chain of command from June 21, 1977 to June 30, 1977.

25. For the period May 19, 1976 to May 12, 1977, Captain Olberding was given an adverse Officer Evaluation Report, which states in part VII that his performance was unsatisfactory, by Lieutenant Colonel Morrissette. It was endorsed by Colonel Reuter. This report was provided to Captain Olberding for comment, and he submitted a rebuttal. Subsequently General Shea provided additional comments which were made a part of the Officer Evaluation Report and filed for record initially in the U.S. Army Military Personnel Center, Washington, D.C., and subsequent to the plaintiff's release from active duty were transferred to the U.S. Army Reserve Components Personnel and Administration Center, St. Louis, Missouri, in the file maintained under the name of Olberding, James Kurt. General Shea's comments specifically indicated that he had arranged for the plaintiff to submit to a psychiatric evaluation and that Captain Olberding, pursuant to that evaluation, was not suffering from any psychiatric disease. General Shea was aware at the time he caused the foregoing communication to be attached to the plaintiff's Officer Evaluation Report that any person reviewing the plaintiff's personnel file, including the Officer Evaluation Report, would read and review the communication. In 1980 plaintiff's personnel file, including the Officer Evaluation Report, was released to and reviewed by a CGSOC (RC) Resolicitation Board for the purpose of determining whether or not the plaintiff could, at his request, be recalled for a temporary active duty status. The plaintiff's request was denied. Before General Shea provided the additional comments to the Office Evaluation Report, he had received and reviewed Dr. Green's written report of the mental status examination, but he did not consult the written report when he added his comments to the Officer Evaluation Report.

26. Following Captain Olberding's removal from ISU, he pressed ISU officials to investigate his allegations regarding the ROTC program. This resulted in the appointment of an ad hoc committee by Dean Russell on August 10, 1977. That committee was chaired by Associate Dean Richard J. VanIten and included Professor Thomas E. Hannum and the new Professor of Military Science, Lieutenant Colonel Frazer (VanIten Committee). This committee issued its report on September 1, 1977.

27. In the course of appointing this committee, Dean Russell informed Associate Dean VanIten of the fact that Captain Olberding had been ordered by his Army superiors to undergo a psychiatric evaluation.

28. Colonel Reuter may have informed Lieutenant Colonel Frazer that Captain Olberding had been ordered to and did consult a psychiatrist. Whatever the source of the information, Lieutenant Colonel Frazer became aware of it.

29. The ROTC unit at ISU is small and rumors regarding the abrupt departure of Captain Olberding were widespread in the fall of 1977. Lieutenant Colonel Frazer felt that he had to deal with these rumors. One way in which Lieutenant Colonel Frazer attempted to deal with this problem was to give a general speech in which he advised the cadets that Captain Olberding was leaving the Army. Another way in which Lieutenant Colonel Frazer dealt with this problem was to meet with senior cadets and to discuss their concerns on a one-to-one basis.

30. On October 3, 1977, in one such meeting, Lieutenant Colonel Frazer met with ROTC senior cadet Todd Turner. In the course of this meeting, Lieutenant Colonel Frazer told Turner that Olberding had been ordered to and did undergo a psychiatric examination and had been relieved of his duties at ISU. He did not tell Turner the results of the examination.

31. On October 3, 1977, in another such meeting, Lieutenant Colonel Frazer also told cadet Scott Zima that Captain Olberding had undergone a psychiatric examination. He did not advise Zima of the results of the psychiatric exam.

32. Shortly following October 3, 1977, Todd Turner advised Captain Olberding of his conversation with Lieutenant Colonel Frazer, whereupon Captain Olberding took no steps to advise Todd Turner of the favorable results of the psychiatric examination. Captain Olberding had Turner execute an affidavit regarding the circumstances of the release of information by Lieutenant Colonel Frazer.

33. Shortly following October 3, 1977, Cadet Zima also advised Captain Olberding of the conversation he had with Lieutenant Colonel Frazer. Captain Olberding did not rebut the information nor explain the circumstances.

34. Major John Glass, in the fall of 1977 advised ROTC students in a leadership lab generally that Captain Olberding had been relieved of his duties at ISU.

35. Both Lieutenant Colonel Frazer and Major Glass used the term "relieved" synonymously with discharged or fired, not in the military sense of relieved for cause under § 2–2F of the Army Personnel Regulation. In fact, Captain Olberding was not relieved for cause.

36. Inasmuch as Captain Olberding was not satisfied with the conclusions of the VanIten Committee, he again, on October 4, 1977, wrote to the University requesting an investigation of the ROTC program. In that letter Captain Olberding stated that he had undergone a psychiatric examination which "resulted in the doctor stating, 'Why are you here, you're quite normal....'" Captain Olberding went on to express the hope, "that the members of ISU's administration will take action to enforce ethical conduct" and to note that the University had the power to have members of the ROTC cadre removed.

37. In response to these allegations, Dean Russell formed another Committee composed of Professor Neil E. Harl, William R. Underhill and Dudley G. Luckett. This was known as the Harl Committee.

38. Captain Olberding was separated from the Army on November 25, 1977. By this date Captain Olberding believed that his effectiveness and utility as an Army officer had been destroyed. Plaintiff testified that, until his discovery of the disclosures about the psychiatric examination, he had made no final determination as to whether he would withdraw his request for release from active duty but, once the disclosures were discovered, he determined that his request should be allowed to proceed.

39. Although the majority of the allegations Captain Olberding made in his request for another University investigation of ROTC are not relevant to this lawsuit, he specifically raised the question of whether or not officers of the defendant had released medical information concerning him, specifically the fact that he had been ordered to and did submit to a psychiatric examination on May 3, 1977. Because of these allegations, the Harl Committee requested that Colonel Reuter answer certain questions. Colonel Reuter consented to a telephone interview by the committee on December 10, 1977. During the taped telephone interview, the committee discussed with Colonel Reuter a number of questions regarding the reasons for the psychiatric examination, its results, and its dissemination. Colonel Reuter summarized the facts leading to the examination as well as the fact that the psychiatrist had called General Shea and orally informed him of the results of this examination. Colonel Reuter advised the committee that the psychiatrist found no mental illness. He spoke from his recollection; he did not have Dr. Green's report in front of him.

40. Captain Olberding appeared before the Harl Committee on numerous occasions and in response to a request from the committee obtained a copy of his mental status evaluation from the Madigan Army Medical Center pursuant to a Freedom of Information Request and provided it to the Harl Committee. He also provided the Harl Committee with a copy of the front page of his officer evaluation report.

41. The Harl Committee issued its report on January 23, 1978.

## CONCLUSIONS OF LAW

5 U.S.C. § 552a(b) provides:

No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless disclosure of the record would be—[enumeration of eleven permitted disclosures].

■ The defendant is an "agency" within the meaning of section 552a(b). 5 U.S.C. §§ 552a(a)(1) & 552(e).

Plaintiff is an "individual" within the meaning of section 552a(b). 5 U.S.C. § 552a(a)(2).

■ The copy of Dr. Green's written report placed in the Department of Psychiatry and Neurology clinical files at Madigan Army Medical Center under plaintiff's name is a "record" within the meaning of section 552a(b). 5 U.S.C. § 552a(a), (3) & (4).

■ The Department of Psychiatry and Neurology clinical files at Madigan Army Medical Center constitute a "system of records" within the meaning of section 552a(b). 5 U.S.C. § 552a(a)(5).

■ One may "disclose" a record within the meaning of section 552a(b) by oral communication. The Act itself provides that the disclosure may be "by any means of communication." *Id.* This has been construed by the defendant itself to include oral communications. 32 C.F.R. § 505.3(b); Army Regulation (AR) 340–21, The Army Privacy Program, paragraph 3–2. *See also* 40 Fed.Reg. 28953.

■ The crucial question in this case—whether there were disclosures prohibited by section 552a(b)—must be answered in the negative. The disclosures of which plaintiff complains were not made as a result of any retrieval of the disclosed information from the copy of Dr. Green's report in the Madigan Army Medical Center files. The disclosures all flowed from General Shea's order to plaintiff to report to Fort Lewis with his medical records, and from General Shea's knowledge of the psychiatric examination, which he ordered, and his knowledge of the results, which he obtained directly from Dr. Green with plaintiff's consent. Neither General Shea nor any other officer of defendant retrieved from the Madigan Army Medical Center files the psychiatric examination record or any information from that record.

■ It is this court's conclusion, based on the authority and reasoning of the following cases, that the only disclosure actionable under section 552a(b) is one resulting from a retrieval of the information initially and directly from the record contained in the system of records. *Jackson v. Veterans Administration,* No. 79 C 2102 (N.D.Ill. Sept. 8, 1980) (unpublished order); *Carin v. United States,* No. 76–2222 (D.D.C. Aug. 5, 1980) (unpublished memorandum); *Savarese v. United States Dep't of Health,* 479 F.Supp. 304, 307–09 (N.D.Ga.1979), *aff'd sub nom., Savarese v. Harris,* 620 F.2d 298 (5th Cir. 1980); *King v. Califano,* 471 F.Supp. 180, 181 (D.D.C.1979).

The foregoing case authorities and the reasoning of those cases also supports this court's further conclusion that the information possessed by General Shea, including the original of Dr. Green's report, did not constitute a "record" which was "contained in a system of records" within the meaning of section 552a(b), even though the information was identical to that contained in Madigan Army Medical Center's system of records. The interpretation contended for by plaintiff—that section 552a(b) is violated if agency personnel disclose information they possess by means other than retrieval from a system of records if they know or have reasonable grounds to believe that the information may also be found in a record contained in a system of records—would create an intolerable burden and would expand the Privacy Act beyond the limits of its purpose, which is to preclude a system of records from serving as the *source* of personal information about a person that is then disclosed without the person's prior consent.

There was no violation of section 552a(b) in this case. If plaintiff was wronged by the Army and some of its officers, it is a wrong for which the Privacy Act does not provide a remedy.

Because the foregoing is dispositive of this case, other issues raised are not adjudicated.

## JUDGMENT ORDER

IT IS ORDERED that the clerk enter judgment for defendant and dismiss plaintiff's complaint.