Zander KROWITZ, Plaintiff,

v.

**DEPARTMENT OF AGRICULTURE, UNITED STATES FOREST SERVICE, Defendant.**

No. M84–303 CA2.

United States District Court, W.D. Michigan, N.D.

Aug. 25, 1986.

Paul M. Marin, Marquette, Mich., for plaintiff; Peter Broida, Washington, D.C., of counsel.

John A. Smietanka, U.S. Atty., Julie Woods, Asst. U.S. Atty., Grand Rapids, Mich., for defendant.

## OPINION

HILLMAN, Chief Judge.

This litigation stems from disclosures regarding the job performance of plaintiff Zander Krowitz ("Krowitz") during his tenure as an administrative officer ("AO") and employee of the Ottawa National Forest ("ONF"). The ONF, headquartered in Ironwood, Michigan, is operated by defendant United States Department of Agriculture, Forest Service ("Forest Service"), and the disclosures were made by Joseph Zylinski ("Zylinski"), Forest Supervisor of the ONF. Plaintiff claims that Zylinski's disclosures violated the Privacy Act of 1974,

("The Act"), specifically Section 3 thereof, codified at 5 U.S.C. § 552a, concerning the disclosure of agency records maintained on individuals. Jurisdiction is premised upon 5 U.S.C. § 552a(g)(1)(D).

The matter was tried to the court in Marquette, Michigan, on February 20, 1986. The court thereafter requested and received post-trial briefs from both parties. Plaintiff also filed a motion for leave to amend his complaint to conform with the evidence offered at trial. This opinion constitutes the court's ruling on that motion and the court's findings of fact and conclusions of law, as required by Rule 52(a), Fed.R.Civ.P.

Zylinski, a Forest Service employee for some 30 years, became Forest Supervisor of the ONF in September 1981. Krowitz had been employed as AO for the ONF since April 17, 1978. Upon Zylinski's arrival in Ironwood, Krowitz befriended him, introducing Mr. and Mrs. Zylinski to Mrs. Krowitz and to the Krowitzes' circle of friends in the community. That circle included a Friday night social "couples' group," comprised of the Krowitzes, the James R. Shaws, the John R. Fitzgeralds, and the Tom Vizankos.

Soon after his arrival in Ironwood, Zylinski developed concerns regarding Krowitz' work performance. Zylinski contacted Mr. Karwoski, a personnel specialist in the Forest Service's Regional Office in Milwaukee, Wisconsin. At Zylinski's request, Karwoski came to the ONF in February 1982 to assess Krowitz' skills, abilities and interests, to suggest alternative career opportunities for him, and to develop a plan of action, jointly with Zylinski, to deal with Krowitz' performance problems. Karwoski reviewed Krowitz' personnel file and interviewed Krowitz, Zylinski, and Frank Voytas, Zylinski's deputy forest supervisor. Following the visit, Karwoski sent Zylinski a memo (Plft's Ex. 1) with his findings and suggestions. Karwoski found Krowitz to be an "idea" person with an aversion to task-oriented duties. Krowitz' AO position required him to handle the business affairs of the ONF and AO performance standards were mainly task-oriented in nature. Karwoski thus concluded that there was a 70–

80 percent certainty that Krowitz would not be able to perform according to those performance standards. Karwoski suggested several alternatives, including counseling Krowitz on possible alternative job placements, while continuing to document his performance inadequacies and advise him on how they might be corrected. After reading the memo and considering its suggestions Zylinski placed it in a file identified as "AO" or "Krowitz" which he had started and kept in his desk.

In addition to this desk file folder, Zylinski identified other files generally maintained on all Forest Service employees, including Krowitz. These included an employee development file ("EDF"), containing documents pertaining to employee training, and an official personnel file ("OPF"), the latter kept at the Regional Office in Milwaukee. The EDFs for ONF employees were kept in the Ironwood office's personnel section headed by personnel officer David Weber and staffed by three employees. The personnel section was located three doors from Zylinski's office. The EDFs, to Zylinski's knowledge, were kept in locked file cabinets within that section, accessible to staff officers without permission but to others with permission only.

Zylinski met with Krowitz on March 31, 1982. In that meeting it was agreed that Krowitz' job emphasis would shift from day-to-day administrative coordination of the business management section to management analysis of a series of Forest Service programs. In a March 31, 1982 letter from Zylinski to Krowitz memorializing this meeting (Pltf's Ex. 2), Krowitz' new job responsibilities were detailed. It was noted that most of his then-current AO responsibilities were being waived to allow ample time for completion of new assigned management analysis projects, and that the changes were considered necessary because "of the difficulties experienced with existing job standards and the need to better channel and utilize [Krowitz'] skills." Zylinski further noted that "the ultimate objective of this action involves an outplacement," and Krowitz was "urged to

expend extra efforts to seek out those opportunities."[1]

Zylinski met with Krowitz again on April 13, 1982 and identified a series of six projects Krowitz was to perform in his new management analyst capacity. The first, entitled "Areas for Contracting," was intended to define areas for Forest Service contracting other than those already developed or then under contract. Krowitz began work on this project in early May 1982 and submitted his report on June 7, 1982. On June 14, 1982, Zylinski and Krowitz met to discuss the quality of that report, which Zylinski found unsatisfactory. This meeting was memorialized in a September 19, 1982 memo (Pltf's Ex. 3) from Zylinski to Krowitz.[2] Zylinski kept his copy of the memo in his desk file. At the conclusion of the June 14, 1982 meeting, Zylinski instructed Krowitz to start on the second special project, due September 30, 1982, which concerned implementation in the ONF of "FLIPS," the Forest Service's automated computerized system.[3]

Krowitz' FLIPS report, due on September 30, 1982, was submitted to Zylinski on September 29, 1982. Zylinski reviewed it himself, had it reviewed by members of his staff, and also sent a copy to Duane Breon, a deputy regional forester at the Regional Office who had a staff experienced in the FLIPS system and its implementation. Kathleen Wolf, a member of Breon's staff, evaluated Krowitz' FLIPS report and forwarded her evaluation of that report (Pltf's Ex. 5) to Zylinski. She pointed out several errors and deficiencies in Krowitz' analysis and report.

On October 5, 1982, plaintiff made a written request (Pltf's Ex. 4) to the Regional Office for assistance under the employee assistance program known as CONCERN, which was designed to help employees having problems other than in the performance area. Plaintiff's letter expressed concern about the deterioration of his AO position during the preceding six months. Zylinski eventually received a copy of this letter from the Regional Office and filed it in his desk file. Plaintiff's letter resulted in a 1½ day visit to the ONF by Ronald V. Rydberg, leader of the Regional Office's Employee Relations and Labor Management Group. Rydberg met individually with Zylinski, Voytas and plaintiff. Following his visit, Rydberg wrote to Zylinski, on November 30, 1982, (Pltf's Ex. 6), expressing his view that the CONCERN program's purview did not embrace plaintiff's problems. He noted that what plaintiff described was not, in reality, a personal problem which he brought to work with him which interfered with his ability to perform (the type of problem CONCERN was designed to address), but rather involved problems arising strictly out of the work environment. Rydberg opined that plaintiff's poor performance was really the root of his poor relations with Forest Service officials and stated that "if he performed well, there would be no issues to discuss here." He noted that the CONCERN program did not intercede between employees and work supervisors on such work problems. He concluded that "the course remaining is to propose [Krowitz'] removal for unacceptable performance," and discussed pro-

1. Regarding outplacement opportunities, Krowitz traveled to Washington, D.C., on May 2 through 7, 1982, on official business. In addition to observing the Forest Service's computer show, he visited the offices of several other government agencies to discuss alternative employment possibilities, and he left his resume at various agencies.

2. Zylinski said the three-month delay in submitting this written evaluation of the first project was because he felt it was important for Krowitz to get started on the next project.

3. The FLIPS computerized network was eventually to connect all Forest Service offices and was designed to perform an array of data and word processing. In Fall 1982, the system was being implemented in various national forests but had not yet been implemented in the ONF. Prior to Fall 1982, Zylinski had received a general orientation on the FLIPS system during several meetings with staff at the Regional Office. He also had a FLIPS manual, or access to one, which covered requirements for locating the FLIPS hardware, fireproofing and security requirements, and other technical information pertaining to implementation and placement of the FLIPS system at the ONF.

cedural precautions pertinent to that proposed course of action. Zylinski kept his copy of this letter from Rydberg in his desk file.

Zylinski also received and filed in his desk file a copy of a November 30, 1982 letter from Mr. Carl Webb to plaintiff (Pltf's Ex. 7) summarizing the Forest Service's investigation of the concerns expressed in plaintiff's October 5, 1982 letter. Mr. Webb also opined that plaintiff's poor performance, rather than personal problems, was the root of his difficulties at the ONF. Mr. Webb urged plaintiff to work directly with Zylinski to improve his performance and concluded that if he did "demonstrate good performance, the concerns expressed in [Krowitz'] October 5, 1982 memo will be taken care of."

On November 1, 1982, Zylinski and Krowitz met to discuss Krowitz' FLIPS project report, which Zylinski found unsatisfactory. This meeting was memorialized in a December 23, 1982 letter from Zylinski to Krowitz (Pltf's Ex. 9), which included some of the criticisms of the project expressed by Ms. Wolf, as well as Zylinski's own comments and criticisms of Krowitz' FLIPS report.[4] Zylinski kept his copy of this letter in his desk file.

Sometime after Krowitz started the third special project, which was due on February 15, 1983, Zylinski prepared some handwritten notes to himself regarding plaintiff (Pltf's Ex. 8). The notes, which Zylinski kept in his desk file, detailed the history of his performance concerns regarding Krowitz and the steps which had been taken regarding those concerns. The notes reflected that prior to Krowitz' preparation of his FLIPS report, Zylinski and the Regional Forester in Milwaukee had discussed the possibility of Krowitz being transferred to the Regional Office's FLIPS team if his FLIPS report had sufficient substance. Because of the subsequent negative Regional Office evaluation by Ms. Wolf finding his FLIPS report essentially unacceptable (Pltf's Ex. 5), the notes reflected that the Regional Forester would not consider the transfer because, in his opinion, Krowitz would not contribute materially to the efforts of the Regional Office FLIPS team.

In accord with the Forest Service's fiscal year, annual performance appraisals of Forest Service employees normally cover the period from October 1 to the following September 30. Since Zylinski didn't arrive at the ONF until September 1981, Krowitz' 1980–81 appraisal was done by Deputy Forest Supervisor Voytas, who had worked with Krowitz during the preceding year. Zylinski prepared Krowitz' appraisal for the year running from October 1, 1981 to September 30, 1982.[5] That appraisal (Pltf's Ex. 10) reflected that Krowitz was meeting performance standards at a level lower than expected. Performance appraisals were filed in "employee performance" file folders, sub-files contained within employee "change-in-status" files also maintained at the ONF.

Zylinski met with Krowitz on December 27, 1982 to discuss Krowitz' work performance deficiencies. That meeting was memorialized in a December 29, 1982 "letter of warning" from Zylinski to Krowitz (Pltf's Ex. 11). The letter detailed their discussions and the steps Krowitz was expected to take to improve his performance. The letter gave Krowitz notice that if his performance did not improve to a satisfactory level within sixty days, or by February 28, 1983, Zylinski would take action to recommend his removal from his position. Zylinski kept his copy of this letter in his desk file.

On January 3, 1983, Zylinski called a staff meeting of those forest management team members who shared supervisory responsibility with him. Zylinski felt it was essential for them to know what was going

---

4. The month and one-half interval between the meeting and this letter evaluation of the FLIPS report was, according to Zylinski, because he felt it was important that Krowitz get started on the third special project, which was due on February 15, 1983.

5. This appraisal was not prepared until December 22, 1982. Zylinski could not recall the reason for this delay in its preparation.

on at the ONF in light of rumors circulating that Krowitz had hired a Washington, D.C., attorney to defend him against a personnel action. Zylinski informed the staff that Krowitz' most recent performance evaluation had been unsatisfactory, that he had been given sixty days to improve his performance, and that the project Krowitz was currently working on was going to be used to measure his performance during that period. The staff was instructed to work with and assist him in any way they could, short of doing the work for him.

Krowitz was eventually discharged from his Forest Service employment on or about April 22, 1983. He appealed his discharge through the Civil Service system, and the United States Merit Systems Protection Board eventually ordered the Forest Service to reinstate him. For the last two and one-half years, Krowitz has worked as a program analyst for the Forest Service on the Huron-Manistee National Forest in Cadillac, Michigan.

Since shortly after their arrival in Ironwood in September, 1981, Zylinski and his wife had been regularly participating in Friday night "couples' group" activities with the Krowitzes, Fitzgeralds, Shaws and Vizankos, after being initially introduced into the group by the Krowitzes. As tensions between Zylinski and Krowitz mounted in the ONF office due to Krowitz' performance problems, tensions also began to mount within the social group. Rumors began circulating in the group in the summer of 1982 regarding work tensions between Zylinski and Krowitz and the possibility that Krowitz' job might be in jeopardy. Mrs. Zylinski was purportedly the source of the rumors, passing the information on to Mrs. Fitzgerald who, in turn, told Mrs. Shaw. Messrs. Fitzgerald and Shaw eventually heard the rumors from their wives. Zylinski stated that his wife was not privy to any detailed information regarding the case because they had a house policy not to discuss personnel problems, but he had told her in very general terms that he was having performance problems with Krowitz.

In November of 1982, Zylinski initiated conversations with Messrs. Shaw, Vizanko and Fitzgerald. Zylinski, aware of the stress being generated in the social group, felt that continued participation by him and his wife would only lead to more stress. His sole purpose in initiating the conversations was to explain to the group members why the Zylinskis would be dropping out of the group.

On November 24, 1982, during a social gathering at the Zylinski home, Zylinski took Shaw aside to privately discuss the matter with him. According to the deposition testimony of Shaw, (1) Zylinski said he was dissatisfied with Krowitz' job performance, did not believe he was competent to do his job, was going to dismiss him sometime in the future, and went into some detail about why he had arrived at that decision; (2) Zylinski generally asserted that Krowitz was slow in performing and didn't have the requisite knowledge to complete an assigned project involving implementation of a computer data system at the ONF; (3) Zylinski generally expressed dissatisfaction with Krowitz' performance in completing assignments and spoke generally of six or eight special projects, without providing specific details of those projects or Krowitz' ability to complete them. Zylinski testified that he may have discussed some of Krowitz' projects with Shaw but only in very general terms. While Shaw may have walked away with the impression that Krowitz was going to be terminated, Zylinski said he was not thinking in terms of any imminent termination at the time of his discussion with Shaw.

Zylinski met Fitzgerald for lunch on November 26, 1982, to discuss the matter with him. At the outset, they agreed that it was common knowledge within the social group that there were work-related problems between Zylinski and Krowitz. Zylinski explained that he had advised Krowitz that his projects were unsatisfactory, that this was creating tension between them and was generating sufficient tension within the social group that the Zylinskis were going to withdraw from the group to ease the tensions. Zylinski recalls stating that Krowitz' work for him had resulted in some

performance problems and he may have discussed, in very general terms, the performance evaluation process and that the end result of that process was possibly termination. Fitzgerald's deposition testimony confirmed that Zylinski reported, in very broad terms, that Krowitz was involved in an evaluation process in which he was coming up short. Zylinski did not provide any details regarding either the process or the areas in which Krowitz was purportedly deficient. Zylinski discussed a "time process" and tasks were implied but not specifically described, according to Fitzgerald. Fitzgerald inferred from the remarks that the process would be winding down in the next couple of months and that a decision would be reached at that time. Zylinski did not discuss any of Krowitz' specific projects, except in the very broadest references to tasks which he had not performed successfully. According to Fitzgerald, Zylinski's comments were in no way personal and Zylinski stated that he liked Krowitz on a personal level. Fitzgerald felt that Zylinski's motivation was strictly social—that, given these facts, the tensions were so great that the Zylinskis would withdraw from the social group.

Also in late November, Vizanko stopped by Zylinski's home to pick up something and Zylinski used the opportunity to advise him of the matter. Zylinski testified that he may have discussed the performance evaluation process in general terms but did not recall telling Vizanko that Krowitz was going to lose his job. Vizanko, in his deposition, recalled being informed that Krowitz was having problems at the office, but Vizanko never knew the nature of the problems and Zylinski did not discuss specifics with him, nor did he mention that a performance evaluation of Krowitz had been or was going to be done. According to Vizanko, because Zylinski did not know how the problems with Krowitz would work out, the Zylinskis were dropping out of the social group to alleviate group tensions.

Plaintiff's December 11, 1984 amended complaint alleges that the three November 1982 disclosures by Zylinski to Messrs. Shaw, Vizanko and Fitzgerald violated the Privacy Act. During the trial, counsel for plaintiff elicited testimony regarding further allegedly unlawful disclosures—the June 1982 disclosure by Zylinski to his wife of performance problems with Krowitz, and the January 1983 disclosure by Zylinski to his wife of performance problems with Krowitz, and the January 1983 disclosure by Zylinski to his forest management team staff regarding Krowitz' unsatisfactory performance appraisal and his placement on a 60-day improvement period. Defendant objected through trial on grounds that such evidence was not within the issues framed by the pleadings. The court reserved its ruling on those objections. Following trial, plaintiff moved for leave to amend his complaint to conform with the evidence offered at trial. Defendant opposes the motion.

■ Pursuant to Rule 15(b), Fed.R. Civ.P.,

"[i]f evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits."

I am satisfied that the presentation of the merits is undeniably served by allowing the amendment sought by plaintiff. I am equally satisfied that the government's defense upon the merits would not be prejudiced by such an amendment in this case.

With respect to the June 1982 disclosure by Zylinski to his wife, plaintiff appropriately points out that the government cannot offer rebuttal evidence since Zylinski himself testified that he did, in fact, disclose to his wife that he was having performance problems with Krowitz. Accordingly, permitting the admission of his testimony on this issue and the amendment sought does not seriously prejudice the government's defense on the merits.

The allegation that the January 1983 disclosures by Zylinski to his staff violated the Privacy Act was included in plaintiff's administrative complaint to the agency and was thoroughly investigated by the government at that time. Plaintiff's Ex. 12 is a thorough internal agency report by Special Agent Boren, prepared in early 1983. That report, part of the government records pertaining to this case, contains an exhaustive investigation regarding the January 1983 staff meeting disclosures. It includes signed statements from all staff members present at that meeting regarding what Zylinski disclosed to them. It is therefore apparent that the government has, since 1983, had detailed knowledge of the fact and nature of the 1983 disclosures, a factor weighing against a finding of prejudice.

For the reasons stated, plaintiff's motion for leave to amend his complaint to conform with the evidence offered at trial is hereby granted. Plaintiff's December 11, 1984 complaint is hereby deemed amended to include Privacy Act claims pertaining to the June 1982 disclosure by Zylinski to his wife, and the January 1983 staff meeting disclosures by Zylinski.

Plaintiff claims that the information disclosed by Zylinski in June 1982, November 1982, and January 1983 was or should have been contained in a system of records, as defined in the Privacy Act, and thus, those disclosures, without Krowitz' consent, violated 5 U.S.C. § 552a(b) which provides, in pertinent part, that:

"[n]o agency shall disclose any record which is contained in a system of records by any means of communication to any person ... except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless disclosure of the record would be—[within any of eleven enumerated permitted disclosures]."

It is disputed that the Forest Service is an "agency" and plaintiff is an "individual" within the meaning of this provision. The definitional section of the Act defines the term "record" to mean,

"any item, collection, or grouping of information about an individual that is

maintained by an agency, including, but not limited to, his education, financial transactions, medical history, and criminal or employment history and that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual, such as a finger or voice print or a photograph."

5 U.S.C. § 552a(a)(4). The term "system of records" is defined to mean:

"a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual."

5 U.S.C. § 552a(a)(5). I find and conclude, and I believe defendant concedes, that plaintiff's Exhibit Nos. 1 through 11 constitute "records" within a "system of records" within the meaning of the Act. Defendant claims, however, that there was no "disclosure of a record contained in a system of records" within the meaning of the Act because, at most, Zylinski disclosed personal opinion and belief and not information retrieved from a record within a system of records.

The Act does not define "disclosure," leaving the meaning of that term to case law development. From a review of the cases interpreting the Act, I am satisfied that the Act's purpose is "to preclude a system of records from serving as the *source* of personal information about a person that is then disclosed without the person's prior consent." (Emphasis in original.) *Olberding v. United States Dept. of Def., Dept. of the Army,* 564 F.Supp. 907, 913 (S.D.Iowa 1982), *aff'd.,* 709 F.2d 621 (8th Cir.1983). The Act was passed in the post-Watergate atmosphere. Congress' primary concern was controlling "the unbridled use of highly sophisticated and centralized information collecting technology," and the Act sought to remedy the threat posed by the "capacity of computers and related systems to collect and distribute great masses of personal information." *Savarese v. United States Dept. of Health, Education and Welfare,* 479 F.Supp. 304,

308 (N.D.Ga.1979), *aff'd. mem. sub nom,* *Savarese v. Harris,* 620 F.2d 298 (5th Cir. 1980), *cert. den.* 449 U.S. 1078, 101 S.Ct. 858, 66 L.Ed.2d 801.

Until 1984, courts unanimously limited the Act's coverage to prohibit only non-consensual disclosure of information initially "retrieved" from a protected system of records "which was at some point a source of the information" disclosed. *Id.; Olberding, supra.* Under the prevailing "retrieval rule" of disclosure:

> "[c]ourts ... unanimously agreed that the Act covers more than the mere physical dissemination of records (or copies) but that it does not necessarily cover disclosure of information merely because the information happens to be contained in the records. The line they draw is that where no statutory exception applies, the Act prohibits nonconsensual disclosure of any information that has been retrieved from a protected record. *See, e.g., Thomas v. United States Dept. of Energy,* 719 F.2d 342 (10th Cir.1983); *Jackson v. Veterans Administration,* 503 F.Supp. 653, 656 (N.D.Ill.1980); *Savarese v. United States Dept. of Health, Education & Welfare,* 479 F.Supp. 304, 307 (N.D.Ga.1979), *aff'd mem. sub. nom. Savarese v. Harris,* 620 F.2d 298 (5th Cir.1980), *cert. denied,* 449 U.S. 1078, 101 S.Ct. 858, 66 L.Ed.2d 801 (1981)."

*Bartel v. Federal Aviation Administration,* 725 F.2d 1403, 1408 (D.C.Cir.1984).

In 1984, the D.C. Circuit in *Bartel* declined to apply the previously unanimous "retrieval" rule to the peculiar facts before it,[6] concluding that the rationale behind the "retrieval" rule did not support "reading out of the Act's coverage" a situation:

> "where an agency official uses the government's sophisticated ... information collecting methods' to acquire personal information for inclusion in a[n official investigative report] record and then discloses that information in an unauthorized fashion [letters to three other F.A.A. employees] without actually physically retrieving it from the record system. Threats to privacy from the government's recordkeeping emanate not only from the ease of retrieval, but also from the ease of collection and utilization of vast amounts of personal information. Given this broad lens view of privacy protection which Congress embraced, the *Savarese* rationale is consistent with extension of the Act's prohibition to nonconsensual disclosure of information as closely connected to the 'maintenance' of a record as the situation here suggests, even absent physical retrieval from a tangible recording. And, in contrast to disclosures of general office knowledge, it would hardly seem an 'intolerable burden' to restrict an agency official's discretion to disclose information in a record that he may not have read but that he had a primary role in creating and using,

---

**6.** Bartel, while an F.A.A. air safety inspector, wanted to file an EEOC complaint on grounds of reverse discrimination. With that purpose in mind, he requested "flight times and rating" of fellow inspectors from the F.A.A. Airmen Certification Branch, after allegedly being assured that such information was public. He actually received the complete airman files of three fellow F.A.A. inspectors, files which contained both public and nonpublic information. He subsequently filed a complaint with the F.A.A. EEOC office. Vincent, chief of an F.A.A. Flight Standards Division, ordered an investigation as to an apparent Privacy Act violation by Bartel. Documents collected in the course of that investigation were placed in an investigative report. Bartel left the F.A.A. before any action was taken on the report. Almost a year after the report was prepared, Vincent, having learned that Bartel was seeking re-employment with the F.A.A., sent letters to the three inspectors whose

files had been sent to Bartel. The letters notified them of Bartel's name and place of work and listed the records Bartel had received on each of them. The letters further reported that an investigation revealed that Bartel had improperly obtained their records and stated that Bartel's actions appeared to constitute a violation of the Privacy Act. Bartel sued claiming that the Vincent letters constituted prohibited nonconsensual disclosures of information about him in violation of the Privacy Act. The District Court dismissed his *pro se* complaint in a brief order contending that Bartel "had used his official position to invade the privacy of fellow employees" and that his complaint accordingly "stands the Privacy Act on its head." The D.C. Circuit vacated the dismissal and remanded the case for further proceedings, finding that Bartel's complaint stated a cause of action under the Privacy Act and that issues of fact remained with respect to his claims thereunder.

where it was because of that record-related role that he acquired the information in the first place."

*Id.,* 725 F.2d at 1410–1411. The *Bartel* court emphasized that the written letter disclosures "on their face purport[ed] to repeat findings and conclusions made as a result of" an investigation which the disclosing official had himself ordered. *Id.,* at 1411. The court vacated the trial court's dismissal of Bartel's *pro se* complaint, ruling that "if the facts are as Bartel states, we cannot agree ... that the Privacy Act does not cover the sending of these letters because they did not constitute 'communication' of a protected 'record.'" *Id.*

■ I am satisfied that *Bartel's* holding is so inextricably intertwined with the peculiar factual situation in that case that it was not intended and should not be permitted to generally displace the previously unanimous "retrieval" rule.[7] Further, because the facts in the case at bar are not analogous to those in *Bartel,* I decline to apply its holding in this case. Zylinski did not use the government's "sophisticated information collecting methods" to acquire personal information on plaintiff for inclusion in an official investigative record, as the agency official did in *Bartel.* As stated, the *Bartel* court was concerned with the "ease of collection and utilization of vast amounts of personal information," and

with the official's primary role in creating and using a record where it was because of his record-related role that he acquired the information in the first place. Zylinski's disclosures did not, as in *Bartel,* "on their face purport to repeat findings and conclusions made as a result of" an investigation which Zylinski himself had ordered. Although Krowitz' performance problems and Zylinski's attempts to deal with them generated documents falling within the Act's definition of "record" and although these "records" were contained within a "system of records" within the meaning of the Act, this is clearly not an instance, as in *Bartel,* where Zylinski used the government's sophisticated information collecting methods to gain personal information for inclusion in an investigative report which he personally ordered and then disclosed that specific report information in written form without actually retrieving it from the record system.

When analyzed using the majority "retrieval" rule, it is apparent that there were no disclosures in violation of the Privacy Act in this case. The testimony of Messrs. Zylinski, Shaw, Fitzgerald and Vizanko supports a finding that the information which Zylinski disclosed to his wife in June 1982 was general in nature and nothing more than independent recollections and personal opinions on his part concerning his

---

7. The *Bartel* opinion repeatedly emphasizes the peculiar factual basis for its holding, to wit: "Because we find that *under the peculiar circumstances of this case,* the letters did in fact communicate sensitive information contained in the [investigative report] ... we conclude that the Act's disclosure protections may have been triggered." *Id.,* 725 F.2d at 1408. [Emphasis added]

"Although they [appellees] cite several cases from other circuits to support their position, none involved *the peculiar set of circumstances present here:* disclosure by an agency official of his official determination made on the basis of an investigation which generated a protected personnel record." *Id.,* at 1409. [Emphasis added]

"Thus, a rigid adherence to the 'retrieval standard' makes little sense *in this case,* whatever its merits as a guideline in other Privacy Act situations.

Therefore, despite dicta from other circuits, we decline to rule, *in the factual context of this*

case, that the Act's coverage is restricted to information directly retrieved from a tangible recording." *Id.,* emphasis in original.

"We do not take issue with the importance of either concern in the interpretation of the Act. But, neither do we think those rationales support reading out of the Act's coverage *the situation we may be dealing with here,* where an agency official uses the government's 'sophisticated ... information collecting' methods to acquire personal information for inclusion in a record and then discloses that information in an unauthorized fashion without actually physically retrieving it from the record system." *Id.,* at 1410. [Emphasis added]

"In short, *if the facts are as Bartel states,* we cannot agree with appellees that the Privacy Act does not cover the sending of these letters because they did not constitute 'communication' of a protected 'record.'" *Id.,* at 1411. [Emphasis added].

work-related problems with Krowitz. I find no evidence of disclosures of specific records, nor any evidence that Zylinski relied upon notes and records pertaining to Krowitz' performance problems prior to or during his discussions with his wife and social friends. The argument propounded by plaintiff, that by virtue of discussing any aspect of his work relationship with Krowitz, Zylinski impermissibly disclosed "records" from a "system of records," has been raised and rejected on sound grounds by several courts. *See, e.g., Savares, supra,* 479 F.Supp. at 308.

 It is well established that independent recollections and opinions are not covered by the Privacy Act. *See, e.g., Thomas, Savarese* and *Olberding, supra; Doyle v. Behan,* 670 F.2d 535 (5th Cir.1982); *Fagot v. Federal Deposit Insurance Corp.,* 584 F.Supp. 1168 (D.C.P.R.1984); *King v. Califano,* 471 F.Supp. 180 (D.D.C.1979). Further, if the information disclosed is previously known, the disclosure does not violate the Privacy Act. *See e.g., Federal Deposit Insurance Corp. v. Dye,* 642 F.2d 833 (5th Cir.1981); *King, supra.* The testimony of Messrs. Zylinski, Shaw, Vizanko and Fitzgerald establishes that the fact of Krowitz' performance problems and the possibility of his eventual termination was known, albeit in rumor form, as early as June 1982. Zylinski's conversations with Messrs. Fitzgerald, Shaw and Vizanko confirmed the rumors, but information he disclosed was, in reality, not much more than that which had previously been rumored— the general information that Krowitz was having performance problems and that his job was potentially in jeopardy because of them. There is no evidence that Zylinski utilized a protected system of records to initially gather or to ultimately retrieve the information on Krowitz which he conveyed to his wife and friends. The source of Zylinski's knowledge of Krowitz' performance was his personal observation of and participation in supervising Krowitz, not a protected record from a system of records within the meaning of the Act. The fact that Zylinski was the custodian of records within a protected system of records, and that those records contained information on

Krowitz' performance problems, does not alter my conclusion that the information Zylinski communicated to his wife and friends was not retrieved from such protected records but, rather, arose strictly from his personal knowledge and observations, fully independent of the records at issue.

Regarding the January 1983 disclosures, I am again satisfied that the information Zylinski disclosed to his staff was similarly based on personal observation and knowledge independent of any protected record. Even assuming, *arguendo,* that Zylinski had retrieved the disclosed information from records protected by the Act, I am equally satisfied that his disclosure of that information to members of the forest management team who shared supervisory responsibility with him constitutes a permitted disclosure "to those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties," pursuant to 5 U.S.C. § 552a(b)(1). I have reviewed the statements of Clyde Knapp, Robert Brenner, Robert Mackender, Jim Thompson and R.B. Burton (Pltf's Ex. 12), the individuals in attendance at the staff meeting. Those statements reveal that Zylinski specifically instructed all staff members in attendance to work with and assist Krowitz on the third project during his 60-day improvement period, short of actually doing the work for him. To perform this assigned task of assisting Krowitz, it is elemental that the staff members needed to know the nature of Krowitz' performance status and problem and the nature of the project on which they were expected to assist him. Accordingly, the disclosures made by Zylinski to his staff during the January 1983 meeting clearly fall within the disclosure exception provided by 5 U.S.C. § 552a(b)(1). *See, Beller v. Middendorf,* 632 F.2d 788, 799 n. 6 (9th Cir.1980), *reh. denied,* 647 F.2d 80, *cert. denied,* 454 U.S. 855, 102 S.Ct. 304, 70 L.Ed.2d 150, *reh. denied,* 454 U.S. 1069, 102 S.Ct. 621, 70 L.Ed.2d 605; *Hernandez v. Alexander,* 671 F.2d 402, 410 (10th Cir.1982); *Parks v.*

*United States Internal Revenue Service,*
618 F.2d 677, 680–681 (10th Cir.1980).

■ The final component of plaintiff's claim is that the Forest Service violated the privacy Act by failing to provide adequate safeguards to prevent disclosure of information protected by the Act. The record evidence, previously recited in this opinion, convinces me that this claim is without merit. Zylinski's testimony satisfies me that the records pertaining to Krowitz were compiled and maintained in substantial compliance with Forest Service rules pertaining to the development and maintenance of records protected by the Act, and I find insufficient evidence to support a claim that the safeguards and rules developed by the Forest Service were inadequate in any respect.

*Conclusion*

Plaintiff's motion for leave to amend his complaint to conform with the evidence offered at trial is granted and his complaint is deemed amended to include Privacy Act claims pertaining to the June 1982 and January 1983 disclosures by Zylinski.

I find and conclude that there were no disclosures violative of the Privacy Act in this case. I further find and conclude that plaintiff has failed to prove, by a preponderance of the evidence, his claim that the Forest Service failed to provide adequate safeguards to prevent disclosure of information protected by the Act. Accordingly, plaintiff's complaint against defendant shall be dismissed, with full prejudice, and judgment shall be entered in favor of defendant, with costs as permitted by law.