Mickey **DOWNIE**, et al., Plaintiffs,

v.

**CITY OF MIDDLEBURG HTS.,**
**et al., Defendants.**

No. 1:98 CV 1396.

United States District Court,
N.D. Ohio,
Eastern Division.

Sept. 30, 1999.

Avery S. Friedman, Friedman & Associates, Cleveland, OH, Kenneth D. Myers, Cleveland, OH, for plaintiffs.

Patrick Michael Foy, Gallagher, Sharp, Fulton & Norman, Cleveland, OH, Leo R. Ward, Michael J. Smakula, Ward & Associates, Cleveland, OH, Timothy T. Reid, Reid, Berry & Stanard, Cleveland, OH, Jeffrey I. Sherwin, Office of the Prosecut-

ing Attorney, Cleveland, OH, Arthur I. Harris, Office of the U.S. Attorney, Cleveland, OH, for defendants.

### MEMORANDUM OF OPINION AND ORDER GRANTING THE MOTION TO DISMISS DEFENDANT UNITED STATES AND GRANTING IN PART AND DENYING IN PART THE MOTION TO DISMISS DEFENDANTS SIEGEL AND SCHNEIDER

WELLS, District Judge.

This case is before the Court on the substituted defendant United States' motion to dismiss the Complaint against the United States and on defendants Siegel and Schneider's motion to dismiss the remaining claims against them. The plaintiffs responded in opposition to both motions; the United States, Siegel, and Schneider filed reply memoranda. For the reasons that follow, the motion to dismiss the substituted defendant United States is granted. The motion to dismiss the remaining claims against defendants Siegel and Schneider is granted in part and denied in part.

### I. *Standard of Analysis*

In considering a motion to dismiss under both Fed.R.Civ.Pro. 12(b)(6) and Fed. R.Civ.Pro. 12(b)(1), a court must:

> construe the complaint in the light most favorable to the plaintiff, accept all the complaint's factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of the claims that would entitle relief... However, the Court need not accept as true legal conclusions or unwarranted factual inferences.

*Grindstaff v. Green,* 133 F.3d 416, 421 (6th Cir.1998); *see also Ohio Nat'l Life, Ins. Co. v. United States,* 922 F.2d 320, 325 (6th Cir.1990) (discussing motions under both 12(b)(6) and 12(b)(1)). The Court's task is thus "necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the plaintiff is entitled to offer evidence to support the claims." *Miller v. Currie,* 50 F.3d 373, 377 (6th

Cir.1995) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).

### II. *Procedural History and Factual Background*

#### A. *Procedural History*

On 8 September 1995, Mickey Downie filed a complaint in this district against the City of Middleburg Heights, John Maddox, Glenn Blatnica, and a Jane Doe. The case was assigned to Judge Manos, but was settled and dismissed on 2 April 1996. Two years later, on 17 June 1998, Mickey Downie and David Wheat filed a second complaint in this district, along with a motion for a temporary restraining order and a preliminary injunction. The complaint named as defendants the City of Middleburg Heights, Middleburg Heights police officer Glenn Blatnica, Ashtabula County Prosecutor Thomas Sartini, Cuyahoga County Chief Assistant Prosecutor Carmen Marino, and federal employees Richard P. Siegel and Thomas Schenider.

Because the new complaint stated that it was related to the 1995 case, it was assigned to Judge John M. Manos who granted the motion for a temporary restraining order on 17 June 1998. That order was vacated, however, once it was discovered that the present litigation was not related to the 1995 case and had thus been erroneously assigned to Judge Manos. Judge Manos returned the case to the clerk for reassignment by random draw on 24 June 1998, and it was ultimately assigned to this Court. A preliminary injunction hearing was held on 9 July 1998, and the request for the preliminary injunction was denied on 20 July 1998.

On 2 November 1998, the United States filed a "Notice of Substitution of the United States for Defendants Richard P. Siegel and Thomas Schneider." This substitution, pursuant to 28 U.S.C. § 2679(d), covers all claims alleged in the complaint against defendants Siegel and Schneider, except those alleging violations of the Constitution of the United States. The United

States then filed two separate motions. In one, it moved that the claims against the United States be dismissed for lack of subject matter jurisdiction. In the other, it moved to dismiss the remaining claims against defendants Siegel and Schneider.

## B. *Factual Background*

The complaint asserts that, in June of 1990, plaintiff Downie was working as an undercover operative for the U.S. Customs Service, endeavoring to identify several major United States corporations that were allegedly funneling money to the governments of Vietnam and China in violation of federal law. (Cplt.¶ 16.) When disagreements arose between Downie and Customs officials over how to conduct the operation, Downie resigned. (Cplt.¶ 20.) According to his letter of resignation, he was concerned both for his safety and about possible corruption. "I am giving serious consideration," he wrote, "to referring the instant case to the FBI to investigate the nexus among the Ohio based violator, his brother who is an aide to a U.S. Congressman and this Congressman's possible contacts with one of the Florida based conspirators." (Pl's Ex. A.)

The complaint alleges further that Downie obtained new employment soon after his resignation. (Cplt.¶ 21.) He was now, the complaint alleges, working for the F.B.I. as part of an undercover operation, "the purpose of which was to expose corrupt Cleveland Police Department officers who were allegedly protecting drug dealers and other criminal activity." (Cplt.¶ 21.) According to the complaint, Downie's work led to the arrest, indictment, and conviction of forty-seven police officers on charges of protecting drug deals in the City of Cleveland. (Cplt.¶ 24.)

The complaint alleges that, despite "plaintiff Downie's exemplary record," defendant Richard P. Siegel, Special Agent–in–Charge of the Cleveland Office of Customs, began what amounts to a three-part campaign to discredit Downie. (Cplt.¶¶ 22, 25.) First, Siegel allegedly wrote and circulated what is sometimes known as a "blackball memo." (Cplt.¶ 25.) It stated in part:

In accordance with chapter 41 of the Special Agent Handbook this office recommends that Mickey Downie ... be prohibited (blacklisted) from any further participation as a source of information for the Customs Service. This source has proven to be both undesirable and unreliable. He reneged on a promise to testify at the conclusion of an undercover investigation, refused to take direction of his control agent and other supervisory agents regarding his activities in an undercover investigation and revealed proprietary Customs information regarding a sensitive undercover investigation to other law enforcement agencies and parties unknown without the permission of the Customs Service. His actions compromised more than one investigation causing possible danger to an undercover Customs Special Agent and the dismissal of criminal charges against at least one defendant.

(Pl's Ex. B.)

Second, the plaintiffs allege, defendant Siegel went beyond the "blackball" memo and "enlisted the assistance" of other defendants. According to the complaint, Siegel first contacted defendant Thomas Schneider (then the Group Supervisor for the Cleveland office of the U.S. Bureau of Alcohol, Tobacco and Firearms) and discredited Downie to Schneider. (Cplt.¶ 29.) Allegedly as a result, Schneider investigated Downie's Federal Firearms License, an act that allegedly culminated in a revocation hearing in September of 1993 at the A.T.F. office in Middleburg Heights, Ohio. (Cplt.¶¶ 30–31.) At the hearing, Schneider allegedly seized Downie's firearm and turned it over to defendant City of Middleburg Heights—despite the fact that Downie was allegedly authorized to carry the firearm. (Cplt.¶ 32.) Schneider then allegedly contacted defendant Blatnica of the Middleburg Heights Police Department and caused him to enter the allegedly false information that Downie had been

arrested for carrying a concealed weapon. (Cplt.¶ 33.) According to the complaint, "defendants Schneider, A.T.F., Blatnica and Middleburg Heights caused plaintiff Downie's weapon to remain seized and the false entry in the police computer regarding the alleged arrest of plaintiff Downie to remain in the computer." (Cplt.¶ 36.)

Finally, the complaint alleges that Downie was hired by Ashtabula County Prosecutor Thomas Sartini to be the director of the Ashtabula County Narcotics Task Force. (Cplt.¶ 49.) As part of that position, Downie was allegedly authorized to hire plaintiff Wheat as his assistant. (Cplt.¶ 51.) Approximately two weeks later, Sartini allegedly called Downie into his office. He then allegedly told Downie that he had been contacted by various federal officials who told him that Downie was "undesirable and unreliable," the same words used in the 13 June 1991 memo. The federal officials also allegedly told Sartini to terminate Downie or the federal officials would no longer work with Sartini in his capacity as county prosecutor. (Cplt.¶¶ 53–56.) Ultimately, Sartini terminated the employment of both Downie and Wheat. (Cplt.¶ 61.)

As a result of the first two alleged events—*i.e.*, the blackball memo and the entry in the state police computer—Downie brought two separate actions. He challenged the revocation of his Federal Firearms License and had his license reinstated in April of 1997. (Cplt.¶ 44.) And he brought suit in federal court in September of 1995, seeking declaratory and injunctive relief against defendants City of Middleburg Heights, Blatnica and others. (Cplt. ¶¶ 37–38; *Downie v. Middleburg Heights, et al.*, N.D.Ohio 1:95 CV 1969.) Downie believes the lawsuit caused Middleburg Heights to return his firearm. (Cplt.¶ 39.) He likewise alleges that the

lawsuit prompted a letter from counsel for the defendants who told Downie that he had never been listed in the police computer as having been arrested, that he had been listed only as a suspect for carrying a concealed weapon, and that his name had been removed from the computer records as of July 1994. (Cplt. ¶¶ 40–41; Pl's Ex. C.)

In the present complaint, however, the plaintiffs allege that both the blackball memo and the report that Downie was arrested for carrying a concealed weapon are still available through police computers. (Cplt.¶ 46.) They assert further that the memo is false, that it has been disseminated through federal law enforcement computers, and that it has prevented plaintiff Downie from gaining meaningful employment in his chosen field. (Cplt.¶¶ 27–28, 46, 64.) They allege that both the named defendants and defendants John Doe 1–10 continue to retaliate against Downie for his law enforcement activities and his efforts to expose official corruption. (Cplt.¶¶ 47–48.) And they allege that both Downie and Wheat "have made numerous attempts to gain meaningful employment in their chosen profession, i.e., law enforcement, and because [of] the afore-mentioned ongoing acts of retaliation and blacklisting, have been unable to secure employment in law enforcement." (Cplt. ¶ 64.)

### III. *Motion to Dismiss Defendant United States*

On 2 November 1998, the United States filed a Notice of Substitution, pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2679(d).[1] This substitution covers all state-law tort claims alleged in the complaint against defendants Siegel and Schneider, except those simultaneously al-

---

1. 28 U.S.C. § 2679(d) provides in pertinent part:

(1) Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or

proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant.

leging violations of the Constitution of the United States. Specifically, it covers:

*Count IV:* The actions of defendants, in entering false arrest records into police computers and entering and maintaining false information in the "blackball memo," constitutes defamation under Ohio law.

*Count VI:* The actions of defendants, in communicating the false information contained in police computer files about plaintiff Downie to others in law enforcement, for the express purpose of unlawfully denying plaintiffs employment in their chosen field, and for no legitimate law enforcement purpose, constitutes an illegal use of the telephone in furtherance of a conspiracy.

*Count VII:* The actions of defendants, in communicating false information about plaintiffs to third parties, which was harmful to plaintiffs' reputations, constitutes defamation under Ohio law.

*Count IX:* The actions of the defendants, in communicating false information about plaintiffs to third parties, causing them to lose employment, constitutes unlawful interference with a business relationship, under Ohio law.

*Count XII:* The acts of defendants, acting in concert with others, constitutes civil conspiracy under Ohio law.

(Cplt.¶¶ 79, 82, 85, 88, 103.) Given the Notice of Substitution, all five of these tort claims are now deemed to be solely against the United States and, hence, subject to the Federal Tort Claims Act ("FTCA").[2] *See* 28 U.S.C. § 2679(b), (d).

 On the same day that it filed the Notice of Substitution, the United States moved to dismiss the complaint against the United States for lack of subject matter jurisdiction, noting that the FTCA limits sharply the courts' authority to hear tort claims against the federal government. Under 28 U.S.C. § 2680(h), the federal government retains its sovereign immunity with respect to a variety of claims, including "[a]ny claim arising out of ... libel, slander, misrepresentation, deceit, or interference with contract rights." Under § 2675, all plaintiffs must exhaust their administrative remedies by "(1) giv[ing] written notice of a claim sufficient to enable the agency to investigate the claim and (2) plac[ing] a value (or 'sum certain') on the claim." *See Glarner v. United States Dept. of Veterans Admin.*, 30 F.3d 697, 700 (6th Cir.1994) (construing 28 U.S.C. § 2675). The timely filing of such a claim is a jurisdictional prerequisite to bringing suit in federal court. *See McNeil v. United States*, 508 U.S. 106, 109, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) (uphold-

---

**2.** The plaintiffs insist that the FTCA does not apply to their case because all counts in the complaint were brought—and remain—under 42 U.S.C. § 1983. Although they concede that a § 1983 claim will not stand unless the plaintiff has alleged a constitutional wrong, *see Baker v. McCollan*, 443 U.S. 137, 140, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979) (holding that the "first inquiry in any § 1983 suit is whether the plaintiff has been deprived of a right 'secured by the Constitution and its laws' "), they maintain that the relevant counts allege not a series of torts, but a single conspiracy between state and federal officials to deprive them of their constitutional rights. As such, the federal officers could be held liable, along with the state defendants, for a violation of § 1983. *See Hampton v. Hanrahan*, 600 F.2d 600, 623 (7th Cir.1979) (holding that, "when federal officers are engaged in a conspiracy with state officials to deprive constitutional rights, the state officials pro-

vide the requisite state action to make the entire conspiracy actionable under section 1983").

The counts at issue, however, do not allege constitutional wrongs and thus cannot fall under § 1983. *See Baker*, 443 U.S. at 146, 99 S.Ct. 2689 (noting that "Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law"). Count IV and VII allege defamation under Ohio law. Count V alleges interference with a business relationship under Ohio law. Count VI sounds in defamation insofar as it claims that the defendants "communicat[ed] false information ... about the plaintiff Downie to others in law enforcement." (Cplt.¶ 85.) And Counts VI and XII speak of civil conspiracies not under the Constitution, but "under Ohio law." (Cplt.¶ 103.) In other words, they allege tort claims—and tort claims only—against the United States.

ing the district court's conclusion that "it lacked jurisdiction to entertain an action 'commenced before satisfaction of the administrative exhaustion requirement'"); *Gillespie v. Civiletti,* 629 F.2d 637, 640 (9th Cir.1980) (stating that the "timely filing of an administrative claim is a jurisdictional prerequisite to the bringing of a suit under the FTCA").

▮ To prevail against the United States' motion to dismiss, then, the plaintiffs' complaint must allege that they have exhausted their administrative remedies, and it must avoid claims based on the exceptions set forth in 28 U.S.C. § 2680. It falls short, however, with respect to both criteria. First, it fails to state that the plaintiffs have satisfied their claims administratively—and the plaintiffs indeed admit they have not done so. (Pl's Resp. at 6.) Second, the complaint against the United States rests exclusively on claims that are barred by 28 U.S.C. § 2680(h). Counts IV and VII allege defamation; Count IX speaks of interference with business relationship; Count VI alleges defamation insofar as the plaintiffs claim the defendants communicated false information to third parties. Count XII's conspiracy claim rests entirely on the now-barred defamation and contract claims, and it must therefore fall as well.[3] In Ohio, "the rule [is] that an underlying unlawful act is required before a civil conspiracy claim can be successful." *See Gosden v. Louis,* 116 Ohio App.3d 195, 219, 687 N.E.2d 481 (1996).

Because the plaintiffs have failed to exhaust their administrative remedies and because their claims against the United States are barred by 28 U.S.C. § 2680(h), this Court is without jurisdiction to hear them. The Motion to Dismiss Defendant

United States of America is thus granted, and Counts IV, VI, VII, IX, and XII against the United States will be dismissed for lack of subject matter jurisdiction.[4]

### IV. Motion to Dismiss Defendants Siegel and Schneider

#### A. Bivens Actions and Alleged Violations of Constitutional Rights

Although the complaint originally listed nine counts against defendants Siegel and Schneider, the United States' Notice of Substitution covered all claims alleging violations of state torts. There are thus four counts remaining against them.

*Count I:* Plaintiffs are entitled to seek employment in their chosen profession, but have been and continue to be precluded from such employment as a direct result of the actions of the defendants and in retaliation for plaintiff Downie exercising his constitutional rights of free speech, free expression and free association, and such actions violate plaintiffs' constitutionally protected rights guaranteed under the First and Fourteenth Amendments to the Constitution.

*Count II:* The actions of the defendants, in maintaining false information about plaintiff Downie in both the national police computers and in the aforementioned "blackball memo," constitute a violation of plaintiffs' First Amendment rights, in that such actions were taken in retaliation for plaintiffs exercising their legitimate and protected First Amendment rights, i.e., exposing governmental corruption.

*Count III:* The actions of the defendants, in publishing false and defama-

---

3. To the extent Count VI constitutes a conspiracy claim, the same logic applies to it as well.

4. The plaintiffs have asked this Court "to grant a stay of this portion of the action pending exhaustion of remedies, as opposed to dismissal," (Pl's Resp. at 6), but this Court is without authority to do so. The Supreme

Court has recently construed the FTCA "to require complete exhaustion of Executive remedies before *invocation* of the judicial process.... The FTCA bars claimants from bringing suits in federal court until they have exhausted their administrative remedies." *See McNeil v. United States,* 508 U.S. 106, 112–13, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) (emphasis added).

tory information about plaintiffs, constitutes a violation of plaintiffs' First Amendment right of access to the courts, in that the actions of the defendants is in retaliation for plaintiff Downie's prior use of the legal system to vindicate his rights.

*Count XI:* The acts of all defendants, acting in concert with others, constitute a conspiracy to deprive plaintiffs of their constitutionally-guaranteed civil rights.

(Cplt.¶¶ 70, 73, 76, 100.) The plaintiffs contend that all four counts allege violations of their constitutional rights, and they thus seek money damages pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).[5]

■■■ *Bivens* does allow plaintiffs to seek money damages from government officials who have violated their Constitutional rights, but government officials performing discretionary functions generally are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *See Wilson v. Layne,* 526 U.S. 603, 119 S.Ct. 1692, 1696, 143 L.Ed.2d 818 (1999) (internal quotes and citations omitted). Hence, a court evaluating a *Bivens* claim must first ask "whether the plaintiff has asserted a violation of a constitutional right at all." *See Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991) (internal citations omitted). If not, the claims must be dismissed. *See Mattox v. Forest Park,* 183 F.3d 515, 521 (6th Cir. 1999) (holding that plaintiffs' failure to al-

lege a constitutional violation is "fatal to their case").

### 1. *Plaintiff David Wheat*

■■ Under this standard, David Wheat's complaint against Siegel and Schneider must fail because it does not allege that the defendants violated his constitutional rights. Count I may assert that both plaintiffs have been precluded from seeking employment in their chosen field, but it also states that any injury is "in retaliation for *plaintiff Downie* exercising his constitutional rights." (Cplt. ¶ 70 (emphasis added.)) Conversely, Count II alleges that both Downie and Wheat's First Amendment rights were violated, but it states that the defendants maintained and published allegedly false information only about Downie. (Cplt.¶ 73.) Count III states that the defendants published false and defamatory information about both plaintiffs, but nowhere does the complaint set forth facts to bolster such a claim with respect to Wheat. And although Count XI alleges that the defendants conspired to deprive both plaintiffs of their constitutional rights, it is difficult to see how they could agree to harm someone they did not know existed. According to the complaint, defendant Sartini was contacted by the federal officials while Wheat was still on his way from California—and thus still unknown to the defendants. (Cplt.¶¶ 53–55.) And Sartini allegedly told Downie that "he had no doubt that plaintiff *Downie* was the victim of ongoing retaliation by the government." (Cplt. ¶ 63 (emphasis added.))

David Wheat's allegations against Siegel and Schneider may thus rise to the level of defamation or libel under state law, but

---

5. The defendants contend that the claims are time-barred under Ohio's two-year statute of limitations. (Mtn. at 16.) The plaintiffs are, however, alleging a continuing series of wrongs, and thus the statute of limitations does not apply.

The defendants also contend that all claims against the John Doe defendants should be dismissed. The plaintiffs correctly assert,

however, that it is too early to do so. "Although designation of a 'John Doe' defendant is not favored in federal court, it is permissible when the identity of the alleged defendant is not known at the time the complaint is filed and plaintiff could identify defendant through discovery." *Yates v. Young,* Nos. 84–5586, 85–5701, 1985 WL 13614 (6th Cir. Aug. 28 1985).

they do not constitute violations of the United States Constitution. Plaintiff Wheat's claims against defendants Siegel and Schneider—*i.e.*, Counts I, II, III, and XI—will therefore be dismissed.

### 2. *Plaintiff Mickey Downie*

■ Count III raises some of the same issues with respect to plaintiff Downie as it did with plaintiff Wheat. The Count raises a retaliation claim, most notably, but that claim rests on the premise that the defendants' retaliatory actions violated Downie's right of access to the courts. (Cplt. ¶ 76.) Nowhere in the complaint, however, does Downie suggest how the defendants might have blocked his access to the courts, nor does Count III mesh with the fact that Downie filed a complaint in federal district court in 1995 and that he is in court now. In other words, Count III may assert a constitutional right, but the complaint fails to suggest how the defendants violated that right. As a result, the Count likewise fails to set forth a claim under *Bivens* and therefore must be dismissed. *See Mattox v. Forest Park,* 183 F.3d at 521.

### B. *Privacy Act*

■ Although Counts I, II, and XI do successfully allege *Bivens* claims insofar as they assert that the defendants retaliated against Downie for exercising his First Amendment rights, the defendants contend that they are barred by the Privacy Act. As they note, the Supreme Court has held that courts should refrain from implying a *Bivens* remedy when "special factors" counseling hesitation are present. *See Bush v. Lucas,* 462 U.S. 367, 378, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983). One such "special factor" is the existence of "a comprehensive legislative scheme providing meaningful remedies against the United States for the violations at issue." *See Sullivan v. United States Postal Svc.,* 944 F.Supp. 191, 195 (W.D.N.Y.1996).

■ Although the Sixth Circuit has not spoken on the issue, a number of lower courts have agreed that the Privacy Act constitutes a legislative scheme comprehensive enough to preclude a *Bivens* action. According to one court:

> The Privacy Act provides a comprehensive scheme for addressing plaintiffs concerns about the inaccuracy of the records and about disclosure of them to third parties. In establishing the Privacy Act, Congress has undertaken to balance the individual interests of the subjects with the interest in protecting certain records and assuring an efficient government. Therefore, pursuant to the *Bush* mandate that courts should refrain from implying a *Bivens* remedy when "special factors" counseling hesitation, such as Congressionally-provided remedies for constitutional violations, are present, the Court concludes that plaintiff's constitutional claims regarding her records and any disclosures by defendants about those records are barred.

*Mittleman v. United States Treasury,* 773 F.Supp. 442, 454 (D.D.C.1991); *see also* 5 U.S.C. § 552a (1996); *Sullivan v. United States Postal Svc.,* 944 F.Supp. at 195 (stating that a " 'comprehensive scheme' for dealing with privacy violations exists in the Privacy Act").

■ The plaintiffs insist the Privacy Act does not apply because they do not claim their privacy was invaded nor do they suggest the government has no right to keep files on plaintiff Downie. They claim, "rather, that the file created, maintained and disseminated was intentionally false and was created, maintained and disseminated by the individual defendants in retaliation for plaintiff Downie exposing official corruption." (Pl's Resp. at 7.)

A review of the Privacy Act reveals, however, that it directly addresses and regulates the conduct surrounding the "blackball" memo of which Downie complains. According to Downie, the memo was written by Richard P. Siegel when he was Special Agent-in-Charge of the Cleveland office of the U.S. Customs Service and was subsequently "placed in federal law enforcement computers that distribute

information worldwide." (Cplt. ¶¶ 26–28; Ex. B.) As such, the memo constitutes a record within the meaning of the Act—an "item ... of information about an individual that is maintained by an agency, including, but not limited to, his ... employment history and that contains his name...." *See* 5 U.S.C. § 552a(a)(4). Downie could thus challenge the memo's allegedly false statements under 5 U.S.C. § 552a(e)(5) which requires agencies to "maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance ... and completeness as is reasonably necessary to assure fairness to the individual in the determination." And he could likewise seek a remedy for his allegation that the Customs Service made the information in the memo available to state and local law enforcement officials and to defendant Sartini. (Cplt. ¶¶ 46, 56.) Under the terms of the Act, an agency may not "disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request." 5 U.S.C. § 552a(b).

As Downie points out, the Privacy Act might not provide him with a complete or exhaustive remedy for his alleged wrong. It does not, for instance, allow for damages against individuals or punitive damages, *see* 5 U.S.C. § 552a(g)(1), and it might preclude an argument that either Siegel or Schneider told state law enforcement officials about the contents of the "blackball" memo without actually retrieving it from the files. *See Krowitz v. Department of Agriculture,* 641 F.Supp. 1536 (W.D.Mich. 1986); *Bartel v. Federal Aviation Admin.,* 725 F.2d 1403 (D.C.Cir.1984). But after *Schweiker v. Chilicky,* 487 U.S. 412, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988), "the fact that remedies are not exhaustive neither mandates nor invites the creation of an alternative avenue of relief under the Constitution." *See Williams v. Department of Veteran Affairs,* 879 F.Supp. 578, 587 (E.D.Va.1995); *see also Jones v. Tennessee Valley Authority,* 948 F.2d 258, 265 (6th Cir.1991) (stating that the fact that

Congress has denied relief for a given claim "is not a ground for implying judicial relief, but rather a ground for denying judicial relief").

Hence, the Privacy Act bars any constitutional claims based on the following: (1) any allegation that the U.S. Customs Service has retained the allegedly false "blackball" memo of 13 June 1991 in its system of records; and (2) any allegation that federal agency personnel wrongfully disseminated the "blackball" memo or information about its contents to other individuals or entities.

## C. *Qualified Immunity*

█ The defendants have argued that, even if the plaintiff has a viable constitutional claim, they are nonetheless immune from suit under the doctrine of qualified immunity. As they point out, federal officials are immune from a *Bivens* action "insofar as their conduct does not violate clearly established statutory or Constitutional rights of which a reasonable person would have known." *See Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). This Court must therefore establish "whether a reasonable official in [the defendants'] position could have believed his conduct to be lawful in light of clearly established law and the information [he] possessed." *See Ecclesiastical Order of the Ism of Am, Inc. v. Chasin,* 845 F.2d 113, 117 (6th Cir.1988). The inquiry is an objective one, but "[w]here an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action." *See Harlow,* 457 U.S. at 819, 102 S.Ct. 2727.

█ According to the defendants, they could not have been expected to know their conduct would violate the plaintiffs constitutional rights. First, they contend that they "were within their rights to label Downie as 'undesirable and unreliable' without infringing on any protected First Amendment rights" because they, as gov-

ernment agents, had a strong interest "in ensuring that their agency's law enforcement activities were not compromised by a defiant or disruptive individual." (Mtn. at 10–11.) Using much the same terms, they later maintain that the law was not clearly established "that an informant's right to speak freely on the issue of exposing governmental corruption in the course of an ongoing undercover operation outweighs the government's interest in promoting efficiency and preventing disruption of its law enforcement activities." (Mtn. at 14–15.) Finally, the defendants argue that a reasonable person in their position would not necessarily know that the First Amendment precluded them from republishing statements on the desirability of an informant. (Mtn. at 16–17.)

In a motion to dismiss, however, the Court must take the plaintiff's allegations as true. *See Grindstaff v. Green*, 133 F.3d 416, 421 (6th Cir.1998). Given that standard, the defendants' arguments are premature. The issue at the center of Downie's complaint is the question of whether he was an unreliable undercover agent. If he was, then a reasonable person in Siegel's position might have been within his rights to forestall Downie from further damaging the work of the U.S. Customs Office.[6] But if Siegel was in fact retaliating against Downie for Downie's efforts to expose governmental corruption, then a reasonable person in his position would know he was violating Downie's constitutional rights. In the plaintiff's terms, the question is not whether the defendants had a right to defend themselves against someone whom they perceive to be an unstable employee. The proper question "is whether the law was clearly established that a government agent cannot knowingly fabricate information about an employee with the intent to harm the employee's career in retaliation for the employee exposing the corrupt motivations behind a government decision to cancel an undercover operation." (Pl's Resp. at 10.) With this

question in mind, the law was clearly established at the time of the alleged events that government officials cannot retaliate against individuals for the exercise of their First Amendment rights. *See Pickering v. Board of Educ.*, 391 U.S. 563, 574–575, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Newsom v. Norris*, 888 F.2d 371, 376 (6th Cir.1989).

Hence, the defendants' motion that the claims against them be dismissed on the grounds of qualified immunity is denied.

### IV. *Conclusion*

For the foregoing reasons, this Court orders the following:

1. The Motion to Dismiss Defendant United States of America is granted, and Counts IV, VI, VII, IX, and XII against the United States are dismissed for lack of subject matter jurisdiction.

2. The Motion to Dismiss Defendants Siegel and Schneider is granted with respect to plaintiff Wheat's claims in Counts I, II, III, and XI.

3. The Motion to Dismiss Defendants Siegel and Schneider is granted with respect to plaintiff Downie's claims in Count III and with respect to any claims in Counts I, II, and XI based on the following: (a) any allegation that the U.S. Customs Service has retained the allegedly false "blackball" memo of 13 June 1991 in its system of records; (b) any allegation that federal agency personnel wrongfully disseminated the "blackball" memo or information about its contents to other individuals or entities.

4. The Motion to Dismiss Defendants Siegel and Schneider is otherwise denied.

IT IS SO ORDERED.

---

6. The plaintiffs point out that the blackball memo was produced one year *after* Downie had resigned from the Customs Office and

long after the alleged disagreement between the two, weakening any government interest in protecting its operations. (Pl's Resp. at 9.)